# CRAIG ET AL. *v.* HARNEY, SHERIFF.

No. 241.   Argued January 9, 1947.—Decided May 19, 1947.

*Marcellus G. Eckhardt* and *Ireland Graves* argued the cause for petitioners. With them on the brief was *Charles L. Black*.

*Jerry D'Unger* argued the cause for respondent. With him on the brief was *John S. McCampbell*.

*Elisha Hanson* and *Letitia Armistead* filed a brief for the American Newspaper Publishers Association, as *amicus curiae,* urging reversal.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE REED.

Petitioners were adjudged guilty of constructive criminal contempt by the County Court of Nueces County, Texas, and sentenced to jail for three days. They sought to challenge the legality of their confinement by applying to the Court of Criminal Appeals for a writ of *habeas corpus.*[1] That court by a divided vote denied the writ and remanded petitioners to the custody of the county sheriff. 149 Tex. Cr. —, 193 S. W. 2d 178. The case is here on a petition for a writ of certiorari which we granted because of the importance of the problem and because the ruling of the Texas court raised doubts whether it conformed to the principles announced in *Bridges* v. *California,* 314 U. S. 252, and *Pennekamp* v. *Florida,* 328 U. S. 331.

---

[1] That appears to be the appropriate remedy in Texas in this type of case. *Ex parte Miller,* 91 Texas Cr. Rep. 607, 240 S. W. 944. As to the Texas procedure where there is an adjudication of contempt for violating an order in a civil cause, see *Thomas* v. *Collins,* 323 U. S. 516.

Petitioners are a publisher, an editorial writer, and a news reporter of newspapers published in Corpus Christi, Texas. The County Court had before it a forcible detainer case, *Jackson* v. *Mayes,* whereby Jackson sought to regain possession from Mayes of a business building in Corpus Christi which Mayes (who was at the time in the armed services and whose affairs were being handled by an agent, one Burchard) claimed under a lease. That case turned on whether Mayes' lease was forfeited because of non-payment of rent. At the close of the testimony each side moved for an instructed verdict. The judge instructed the jury to return a verdict for Jackson. That was on May 26, 1945. The jury returned with a verdict for Mayes. The judge refused to accept it and again instructed the jury to return a verdict for Jackson. The jury returned a second time with a verdict for Mayes. Once more the judge refused to accept it and repeated his prior instruction. It being the evening of May 26th and the jury not having complied, the judge recessed the court until the morning of May 27th. Again the jury balked at returning the instructed verdict. But finally it complied, stating that it acted under coercion of the court and against its conscience.

On May 29th Mayes moved for a new trial. That motion was denied on June 6th. On June 4th an officer of the County Court filed with that court a complaint charging petitioners with contempt by publication. The publications referred to were an editorial and news stories published on May 26, 27, 28, 30, and 31 in the newspapers with which petitioners are connected. We have set forth the relevant parts of the publications in the appendix to this opinion. Browning, the judge, who is a layman and who holds an elective office, was criticised for taking the case from the jury. That ruling was called "arbitrary action" and a "travesty on justice." It was deplored that a layman, rather than a lawyer, sat as judge. Groups of

local citizens were reported as petitioning the judge to grant Mayes a new trial and it was said that one group had labeled the judge's ruling as a "gross miscarriage of justice." It was also said that the judge's behavior had properly brought down "the wrath of public opinion upon his head," that the people were aroused because a service man "seems to be getting a raw deal," and that there was "no way of knowing whether justice was done, because the first rule of justice, giving both sides an opportunity to be heard, was repudiated." And the fact that there could be no appeal from the judge's ruling to a court "familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel" was deplored.

The trial judge concluded that the reports and editorial were designed falsely to represent to the public the nature of the proceedings and to prejudice and influence the court in its ruling on the motion for a new trial then pending. Petitioners contended at the hearing that all that was reported did no more than to create the same impression that would have been created upon the mind of an average intelligent layman who sat through the trial. They disclaimed any purpose to impute unworthy motives to the judge or to advise him how the case should be decided or to bring the court into disrepute. The purpose was to "quicken the conscience of the judge" and to "make him more careful in discharging his duty."

The Court of Criminal Appeals, in denying the writ of *habeas corpus,* stated that the "issue before us" is "whether the publications . . . were reasonably calculated to interfere with the due administration of justice" in the pending case. 193 S. W. 2d p. 186. It held that "there is no escape from the conclusion that it was the purpose and intent of the publishers . . . to force, compel, and coerce Judge Browning to grant Mayes a new trial. The only reason or motive for so doing was because the publishers did not agree with Judge Browning's decision

or conduct of the case. According to their viewpoint, Judge Browning was wrong and they took it upon themselves to make him change his decision." *Id.,* pp. 188–189. The court went on to say that "It is hard to conceive how the public press could have been more forcibly or substantially used or applied to make, force, and compel a judge to change a ruling or decision in a case pending before him than was here done." *Id.,* p. 189. The court distinguished the *Bridges* case, noting that there the published statements carried threats of future adverse criticism and action on the part of the publisher if the pending matter was not disposed of in accordance with the views of the publisher, that the views of the publisher in the matter were already well-known, and that the *Bridges* case was not private litigation but a suit in the outcome of which the public had an interest. *Id.,* p. 188. It concluded that the facts of this case satisfied the "clear and present danger" rule of the *Bridges* case. That test was, in the view of the court, satisfied "because the publications and their purpose were to impress upon Judge Browning (a) that unless he granted the motion for a new trial he would be subjected to suspicion as to his integrity and fairness and to odium and hatred in the public mind; (b) that the safe and secure course to avoid the criticism of the press and public opinion would be to grant the motion and disqualify himself from again presiding at the trial of the case; and (c) that if he overruled the motion for a new trial, there would be produced in the public mind such a disregard for the court over which he presided as to give rise to a purpose in practice to refuse to respect and obey any order, judgment, or decree which he might render in conflict with the views of the public press." *Id.,* p. 189.

The court's statement of the issue before it and the reasons it gave for holding that the "clear and present danger" test was satisfied have a striking resemblance to the findings which the Court in *Toledo Newspaper Co.* v.

*United States,* 247 U. S. 402, held adequate to sustain an adjudication of contempt by publication.[2]   That case held that comment on a pending case in a federal court was punishable by contempt if it had a "reasonable tendency" to obstruct the administration of justice.   We revisited that case in *Nye* v. *United States,* 313 U. S. 33, 52, and disapproved it.   And in *Bridges* v. *California, supra,* we held that the compulsion of the First Amendment, made applicable to the States by the Fourteenth (*Schneider* v. *Irvington,* 308 U. S. 147; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108) forbade the punishment by contempt for comment on pending cases in absence of a showing that the utterances created a "clear and present danger" to the administration of justice.   314 U. S. pp. 260–264.   We

---

[2] The findings which the Court in that case sustained were as follows:

"(a) Because . . . their manifest purpose was to create the impression on the mind of the court that it could not decide in the matter before it in any but the one way without giving rise to such a state of suspicion as to the integrity or fairness of its purpose and motives as might engender a shrinking from so doing. (b) Because the publications directly tended to incite to such a condition of the public mind as would leave no room for doubt that if the court, acting according to its convictions, awarded relief, it would be subject to such odium and hatred as to restrain it from doing so.   (c) Because the publications also obviously were intended to produce the impression that any order which might be rendered by the court in the discharge of its duty, if not in accord with the conceptions which the publications were sustaining, would be disregarded and cause a shrinking from performing duty to avoid the turmoil and violence which the publications, it may be only by covert insinuation, but none the less assuredly, invited.   And (d) because the publications were of a character, not merely because of their intemperance but because of their general tendency, to produce in the popular mind a condition which would give rise to a purpose in practice to refuse to respect any order which the court might render if it conflicted with the supposed rights of the city espoused by the publications."

247 U. S. pp. 414–415.

reaffirmed and reapplied that standard in *Pennekamp* v. *Florida, supra,* which also involved comment on matters pending before the court. We stated, p. 347:

> "Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice."

Neither those cases nor the present one raises questions concerning the full reach of the power of the state to protect the administration of justice by its courts. The problem presented is only a narrow, albeit important, phase of that problem—the power of a court promptly and without a jury trial to punish for comment on cases pending before it and awaiting disposition. The history of the power to punish for contempt (see *Nye* v. *United States, supra; Bridges* v. *California, supra*) and the unequivocal command of the First Amendment serve as constant reminders that freedom of speech and of the press should not be impaired through the exercise of that power, unless there is no doubt that the utterances in question are a serious and imminent threat to the administration of justice.

In a case where it is asserted that a person has been deprived by a state court of a fundamental right secured by the Constitution, an independent examination of the facts by this Court is often required to be made. See *Norris* v. *Alabama,* 294 U. S. 587, 590; *Pierre* v. *Louisiana,* 306 U. S. 354, 358; *Chambers* v. *Florida,* 309 U. S. 227, 228–229; *Lisenba* v. *California,* 314 U. S. 219, 237–238;

*Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148. This is such a case.

We start with the news articles. A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.

The articles of May 26, 27, and 28 were partial reports of what transpired at the trial. They did not reflect good reporting, for they failed to reveal the precise issue before the judge. They said that Mayes, the tenant, had tendered a rental check. They did not disclose that the rental check was post-dated and hence, in the opinion of the judge, not a valid tender. In that sense the news articles were by any standard an unfair report of what transpired.[3] But inaccuracies in reporting are

---

[3] The charge against petitioners also set forth other allegedly false statements: (1) that Mayes was not an ex-insurance man but in the insurance business at the time; (2) that terms of the contract on which Jackson sued were not disclosed; (3) that the arrangements under which the premises had been operated for some months before Mayes was inducted into the armed services were not disclosed; (4) that the articles failed to state the legal grounds on which Jackson's motion for an instructed verdict was argued and granted; (5) that much material evidence was omitted which would have enabled the public to form a fair estimate of the nature of the controversy; (6) that the principal plaintiffs who were highly respected business and professional men of Corpus Christi were not named.

These omissions, though reflecting on the quality of the reporting, do not seem to us to be of importance here.

commonplace. Certainly a reporter could not be laid by the heels for contempt because he missed the essential point in a trial or failed to summarize the issues to accord with the views of the judge who sat on the case. Conceivably, a plan of reporting on a case could be so designed and executed as to poison the public mind, to cause a march on the court house, or otherwise so disturb the delicate balance in a highly wrought situation as to imperil the fair and orderly functioning of the judicial process. But it takes more imagination than we possess to find in this rather sketchy and one-sided report of a case any imminent or serious threat to a judge of reasonable fortitude. See *Pennekamp* v. *Florida, supra.*

The accounts of May 30 and 31 dealt with the news of what certain groups of citizens proposed to do about the judge's ruling in the case. So far as we are advised, it was a fact that they planned to take the proposed action. The episodes were community events of legitimate interest. Whatever might be the responsibility of the group which took the action, those who reported it stand in a different position. Even if the former were guilty of contempt, freedom of the press may not be denied a newspaper which brings their conduct to the public eye.

The only substantial question raised pertains to the editorial. It called the judge's refusal to hear both sides "high handed," a "travesty on justice," and the reason that public opinion was "outraged." It said that his ruling properly "brought down the wrath of public opinion upon his head" since a service man "seems to be getting a raw deal." The fact that there was no appeal from his decision to a "judge who is familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly" was a "tragedy." It deplored the fact that the judge was a "layman" and not a "competent attorney." It concluded that the "first rule of justice" was to give both

sides an opportunity to be heard and when that rule was "repudiated," there was "no way of knowing whether justice was done."

This was strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one "who ventures to publish anything that tends to make him unpopular or to belittle him . . . ." See *Craig* v. *Hecht,* 263 U. S. 255, 281, Mr. Justice Holmes dissenting. The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.

We agree with the court below that the editorial must be appraised in the setting of the news articles which both preceded and followed it. It must also be appraised in light of the community environment which prevailed at that time. The fact that the jury was recalcitrant and balked, the fact that it acted under coercion and contrary to its conscience and said so were some index of popular opinion. A judge who is part of such a dramatic episode can hardly help but know that his decision is apt to be unpopular. But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Conceivably a campaign could be so managed and so aimed at the sensibilities of a particular judge and the matter pending before him as to cross the forbidden line. But the episodes we have here do not fall in that category. Nor can we assume that the trial judge was not a man of fortitude.

The editorial's complaint was two-fold. One objection or criticism was that a layman rather than a lawyer sat on the bench. That is legitimate comment; and its relevancy

could hardly be denied at least where judges are elected. In the circumstances of the present case, it amounts at the very most to an intimation that come the next election the newspaper in question will not support the incumbent. But it contained no threat to oppose him in the campaign if the decision on the merits was not overruled, nor any implied reward if it was changed. Judges who stand for reelection run on their records. That may be a rugged environment. Criticism is expected. Discussion of their conduct is appropriate, if not necessary. The fact that the discussion at this particular point of time was not in good taste falls far short of meeting the clear and present danger test.

The other complaint of the editorial was directed at the court's procedure—its failure to hear both sides before the case was decided. There was no attempt to pass on the merits of the case. The editorial, indeed, stated that there was no way of knowing whether justice was done. That criticism of the court's procedure—that it decided the case without giving both sides a chance to be heard—reduces the salient point of the case to a narrow issue. If the point had been made in a petition for rehearing, and reduced to lawyer's language, it would be of trifling consequence. The fact that it was put in layman's language, colorfully phrased for popular consumption, and printed in a newspaper does not seem to us to elevate it to the criminal level. It might well have a tendency to lower the standing of the judge in the public eye. But it is hard to see on these facts how it could obstruct the course of justice in the case before the court. The only demand was for a hearing. There was no demand that the judge reverse his position—or else.

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California, supra,* p. 271. But there was here no threat or menace to the integrity of the trial. The

editorial challenged the propriety of the court's procedure, not the merits of its ruling. Any such challenge, whether made prior or subsequent to the final disposition of a case, would likely reflect on the competence of the judge in handling cases. But as we have said, the power to punish for contempt depends on a more substantial showing. Giving the editorial all of the vehemence which the court below found in it we fail to see how it could in any realistic sense create an imminent and serious threat to the ability of the court to give fair consideration to the motion for rehearing.

There is a suggestion that the case is different from *Bridges* v. *California, supra,* in that we have here only private litigation, while in the *Bridges* case labor controversies were involved, some of them being criminal cases. The thought apparently is that the range of permissible comment is greater where the pending case generates a public concern. The nature of the case may, of course, be relevant in determining whether the clear and present danger test is satisfied. But, the rule of the *Bridges* and *Pennekamp* cases is fashioned to serve the needs of all litigation, not merely select types of pending cases.

*Reversed.*

[For concurring opinion of MR. JUSTICE MURPHY, see *post,* p. 383. For dissenting opinions of MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON, see *post,* pp. 384, 394.]

## APPENDIX.

On May 26, 1945, a *news item* stated:

"Burchard further claimed that although he had not known of the option clause, when he learned of it he had immediately proffered a check for $275 rental."

On May 27, 1945, there was a *news item* which stated:

"At 7 p. m. Browning, without listening to argument from counsel for either side on a plaintiff's motion presented by Dudley Tarlton for Jackson, and without giving the six-man jury opportunity to weigh the evidence, instructed the jury to find against Mayes.

"Walter M. Lewright, Mayes' attorney, protested that the court's arbitrary action had ruled that Tarlton's 'one-page motion' did not need supporting argument and citation of authorities."

On May 28, 1945, an *article* said:

"Browning accepted Tarlton's one-page motion, and without permitting argument or citation of authorities to support the motion, ruled that it be granted. The effect of this ruling was that Browning took the matter from the jury."

That article also included the following statement made by Mayes' attorney to the jury on May 27, 1945:

"However, I now advise you that under the law, Judge Browning has the right to compel you, even against the dictates of your conscience, to sign the verdict he has ordered.

"As a matter of fact, it is probable that he has the power to put you in jail until such time as you do sign it, and I rather imagine, from what has heretofore taken place in this trial, that unless you do sign the verdict, he will cause you to be put in jail.

"As I and my clients feel that you have done all in your power to register your protest and revulsion of feeling at the effect of this decision reached by Judge Browning; as you are helpless to do anything further; and as making you suffer by remaining locked up will not do us a bit of good, I suggest that you sign the verdict and return to your homes with a clear con-

science of having done all that you could to protect the rights of a man whom I feel, and evidently you feel, has been done a gross injustice.

"While we have no appeal from the court's decision in this case, we do have the right again to appeal to his conscience by presenting a motion for new trial in this action—and which motion we will file and argue strenuously with the hope that in the meantime he will see the error committed and will rectify the same.

"There cannot be any doubt but that the action of you men in registering your protest against this decision, as you have done, will affect him. At least, I can only hope that it will. I sincerely thank you."

On May 30, 1945, an *editorial* stated:

"Browning's behavior and attitude has brought down the wrath of public opinion upon his head, properly so. Emotions have been aggravated. American people simply don't like the idea of such goings on, especially when a man in the service of his country seems to be getting a raw deal . . . Then the plaintiff's counsel offered a motion for an instructed verdict for his client. It was granted immediately, without having him cite his authority or without giving the defendant's attorney a chance to argue against it.

"That was the travesty on justice, the judge's refusal to hear both sides. That's where a legal background would have served him in good stead. It is difficult to believe that any lawyer, even a hack, would have followed such high handed procedure in instructing a jury. It's no wonder that the jury balked and public opinion is outraged.

"The fact that a serviceman is involved lends drama to the event. But it could have happened to anyone, it can happen to anyone, with a layman sitting as

judge in a case where fine points of law are involved. True, the idea that only lawyers are qualified to occupy most public offices has been run into the ground, and in most instances a competent layman would be better qualified, but the county judge's office is an exception. He should be a competent attorney as well as a competent businessman.

"It's the tragedy in a case of this sort that the court where the controversial decision was handed down is the court of last resort. It's too bad that appeal can't be made to a district court and heard by a judge who is familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly . . . There is no way of knowing whether justice was done, because the first rule of justice, giving both sides an opportunity to be heard, was repudiated."

On May 30, 1945, there appeared a *report* of a resolution passed by the Sailor's and Soldier's Advisory Council of Corpus Christi "labeling County Judge Joe D. Browning's order for a directed verdict against Mayes a 'gross miscarriage of justice.' " That *article* further stated:

"The council's resolution called on Browning to grant Mayes a new trial on the grounds that he had committed an error in instructing the jury to find for the plaintiff. The petition asked that Browning, upon granting the new trial, should disqualify himself to further sit as judge in the trial, and should permit the trial to be retried before another judge and jury . . . The trial reached a climax Saturday night when Browning, on motion of Dudley Tarlton, Jackson's counsel, and without argument or citation of authority, instructed the six-man County Court jury to find for Jackson. The jury twice refused,

both times bringing in verdicts in favor of Mayes and against Jackson.

"Browning had the jury confined to the court house jury room all Saturday night. Sunday morning, when the court convened, the jury reported that it still had not signed the verdict in favor of Jackson.

"Browning announced that he would lock the jury up again until Monday morning. However, Walter M. Lewright advised the jurymen that they should not continue to 'suffer' any longer, and should sign the verdict, since Browning had the legal right to force them to do so. The jury signed the verdict, but appended a statement asserting that they did so under pressure."

On May 31, 1945, a *news story* said:

"Three local groups were reported last night to be preparing petitions requesting County Judge Joe D. Browning to grant Pvt. Joe L. Mayes a new trial in the Playboy Cafe ouster suit.

"One petition is reported being drawn by a parents and teachers' group, another by a service mothers' group, and the third is being drawn for independent circulation among parents of men in service.

"The new petitions are said to follow the general outline of a petition adopted by the Corpus Christi Soldier's and Sailor's Advisory Council Tuesday night. This petition called on Browning to grant a new trial and upon doing so to disqualify himself and permit the trial to go on under another judge and jury. Action on the petitions is expected shortly.

"The council's petition, drawn up by five veterans' organizations with a membership of more than 1,000, followed by a few hours the filing of a motion for a new trial by Walter M. Lewright and LeGrand Woods, Mayes' counsels . . . It came to a climax Sunday

when Browning Saturday night accepted without argument or citation of authority a motion by Dudley Tarlton Jackson's lawyer, for an instructed verdict . . . The jury was kept Saturday night in the Court House. Sunday morning, following a threat by Browning to keep the jury together until they did sign, the jurymen signed the verdict, appending a statement that they did so against the dictates of their conscience."

MR. JUSTICE MURPHY, concurring.

While joining in the opinion of the Court, I believe that the importance of the problem raised by this case cannot be overemphasized. A free press lies at the heart of our democracy and its preservation is essential to the survival of liberty. Any inroad made upon the constitutional protection of a free press tends to undermine the freedom of all men to print and to read the truth.

In my view, the Constitution forbids a judge from summarily punishing a newspaper editor for printing an unjust attack upon him or his method of dispensing justice. The only possible exception is in the rare instance where the attack might reasonably cause a real impediment to the administration of justice. Unscrupulous and vindictive criticism of the judiciary is regrettable. But judges must not retaliate by a summary suppression of such criticism for they are bound by the command of the First Amendment. Any summary suppression of unjust criticism carries with it an ominous threat of summary suppression of all criticism. It is to avoid that threat that the First Amendment, as I view it, outlaws the summary contempt method of suppression.

Silence and a steady devotion to duty are the best answers to irresponsible criticism; and those judges who feel the need for giving a more visible demonstration of

their feelings may take advantage of various laws passed for that purpose which do not impinge upon a free press. The liberties guaranteed by the First Amendment, however, are too highly prized to be subjected to the hazards of summary contempt procedure.

MR. JUSTICE FRANKFURTER, with whom THE CHIEF JUSTICE concurs, dissenting.

Today's decision, in effect though not in terms, holds unconstitutional a power the possession of which by the States this Court has heretofore deemed axiomatic.

It cannot be repeated too often that the freedom of the press so indispensable to our democratic society presupposes an independent judiciary which will, when occasion demands, protect that freedom. To help achieve such an independent judiciary and to protect its members in their independence, the States of the Union, from the very beginning and throughout our history, have provided for prompt suppression and punishment of interference with the impartial exercise of the judicial process in an active litigation. Interference was punished not by the ordinary criminal process of trial before a jury, but through a distinctive proceeding, summary in character in the sense that a judge without a jury might impose punishment. Such protective measures against publications seriously calculated to agitate the disinterested operation of the judicial process in a litigation awaiting disposition have been deemed part of the constitutional authority of the States to establish courts to do justice as between man and man and between man and society.

The opinion of the Court reviews the Texas Court as though we were merely reviewing the judgment of a court lower in the judiciary hierarchy. Formally, no doubt, we have before us the correctness of a decision of the Court of Criminal Appeals of Texas. But that decision is challenged as offending the Due Process Clause

of the Fourteenth Amendment. We are not, therefore, merely reviewing a decision of the Texas Court; we are passing upon the power of the State of Texas. "The question before us must be considered in the light of the total power the State possesses . . ." *Skiriotes* v. *Florida,* 313 U. S. 69, 79. To paraphrase what was said in *Rippey* v. *Texas,* 193 U. S. 504, 509, the question for us is this: if Texas had expressly provided in its Constitution that publications in the circumstances here found by the Texas Court shall constitute contempt of court, would this Court hold that such finding by the Texas Court and such a provision in the Texas Constitution collide with the Constitution of the United States?

Texas, speaking through its authoritative judicial voice, says: "When the several publications in the instant case are considered together and in their chronological order of appearance, there is no escape from the conclusion that it was the purpose and intent of the publishers thereof to force, compel, and coerce Judge Browning to grant Mayes a new trial. The only reason or motive for so doing was because the publishers did not agree with Judge Browning's decision or conduct of the case. According to their viewpoint, Judge Browning was wrong and they took it upon themselves to make him change his decision." 149 Tex. Cr. —, 193 S. W. 2d 178, 188–89.

After a painstaking examination of the series of publications in the setting of the circumstances of the case, and an extended hearing, all of which comprises a record here of more than four hundred pages, the Court below reached this conclusion: "It is hard to conceive how the public press could have been more forcibly or substantially used or applied to make, force, and compel a judge to change a ruling or decision in a case pending before him than was here done. The publications were not only reasonably calculated to accomplish that purpose but there was also a 'clear and present danger' that they would and the like-

lihood that such result would follow was 'extremely serious' and the degree of 'imminence extremely high.'" 149 Tex. Cr. —, 193 S. W. 2d at 189.   It must be emphasized that the publications in question were made after it was notorious that a motion for a new trial had already been made and would shortly be heard.   In the light of this crucial fact—that the trial judge would shortly be called upon to reconsider his instruction to the jury to find for the plaintiff—the court below found that

> "the publications and their purpose were to impress upon Judge Browning (a) that unless he granted the motion for a new trial he would be subjected to suspicion as to his integrity and fairness and to odium and hatred in the public mind; (b) that the safe and secure course to avoid the criticism of the press and public opinion would be to grant the motion and disqualify himself from again presiding at the trial of the case; and (c) that if he overruled the motion for a new trial, there would be produced in the public mind such a disregard for the court over which he presided as to give rise to a purpose in practice to refuse to respect and obey any order, judgment, or decree which he might render in conflict with the views of the public press."   149 Tex. Cr. —, 193 S. W. 2d at 189.

The Court minimizes these findings by pointing to a likeness between them and those that were made in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, and found inadequate by Mr. Justice Holmes' dissent, an inadequacy subsequently supported by our decision in *Nye* v. *United States,* 313 U. S. 33.   The Court also draws on *Craig* v. *Hecht,* 263 U. S. 255, as though what was said there applies here.   But those three cases involved only the construction of the federal statute.   Congress decided to allow the power to punish for contempt theretofore vested in the lower federal courts, when invoked against misbe-

havior not in the presence of the court, only when such misbehavior was "so near" the presence of the court "as to obstruct the administration of justice." Act of March 2, 1831, 4 Stat. 487; § 268 of the Judicial Code, 28 U. S. C. § 385; *Nye* v. *United States, supra.* Texas, however, has seen fit not to restrict the power of its courts to punish for contempt as does the federal statute. The power to punish for contempt which the Texas legislature granted to its courts more than a hundred years ago is not restricted as Congress restricted the contempt power of the lower federal courts. See Acts 1846, p. 200; Vernon's Texas Statutes, Art. 1955. It is an inadmissible jump from finding that conduct is not contempt within the federal Act, to finding that an exertion of State power offended the Fourteenth Amendment. Yet the Court now finds that Texas has transgressed the implications of the Due Process Clause by punishing conduct which this Court in the *Toledo* case thought was within the scope even of the federal Act—a construction which it occurred to no member of the Court to question on constitutional grounds.

The difference between the issue before us and that raised by the *Toledo* and *Craig* cases is basic. In those cases the Court had before it, and Mr. Justice Holmes was concerned only with, the proper application of a federal statute setting a narrowly confined scope to the power to punish for contempt. The Court was not concerned with the Constitutional power of the States to enforce a broader contempt policy. Such a power, in fact, had been assumed to be beyond doubt. "When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." So wrote Mr. Justice Holmes for this Court. *Patterson* v. *Colorado,* 205 U. S. 454, 463. To be sure, he wrote this forty years

ago, and on several occasions thereafter, as part of the formulation of his profound tolerance for freedom of expression, he spoke out against misuse of the power to punish for contempt. But nothing that that great judge ever wrote qualified in the slightest his conviction that the theory of our system of justice is "that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado, supra,* at 462. Mr. Justice Holmes had no tolerance whatever for any special claim by judges to immunity from criticism. He was against anything that smacked of summary proceeding for what was known as "scandalizing the court," that is, speaking ill of a court as an institution and thereby argumentatively bringing it into disrepute. He would allow summary punishment of conduct calculated to affect a judge in the discharge of his duty only as to matters "pending" before him in the active sense of that term. "It is not enough that somebody may hereafter move to have something done." So he wrote, dissenting, in *Craig* v. *Hecht, supra,* at 281. And in his misapplied dissent in the *Toledo* case he expressed his impatience with federal judges who take notice of newspaper comments to which a judge should be indifferent. But his opinion in that case conveys not a doubt as to the power of States to enforce a policy for the punishment of contempt in relation to a pending case, though the State policy be not limited as Congress limited the power of the federal courts to punish for contempt. There is not a breath of a suggestion in the opinion in the *Nye* case that the restricted geographic meaning which the Court gave to the Act of Congress designed to limit the power of the lower federal courts was required by constitutional considerations. The opinions of Mr. Justice Holmes contain not the remotest hint that

the Due Process Clause withdrew from the States the power to base a finding of contempt on publication aimed at a particular outcome of a matter awaiting adjudication. And it is worthy of note that in the very opinion in which the phrase "clear and present danger" was first used by Mr. Justice Holmes, he referred to his opinion in the *Patterson* case, and not with disapproval. See *Schenck* v. *United States*, 249 U. S. 47, 51–52.

We are not dealing here with criticisms, whether temperate or unbridled, of action in a case after a judge is through with it, or of his judicial qualifications, or of his conduct in general. Comment on what a judge has done—criticism of the judicial process in a particular case after it has exhausted itself—no matter how ill-informed or irresponsible or misrepresentative, is part of the precious right of the free play of opinion. Whatever violence there may be to truth in such utterances must be left to the correction of truth.

The publications now in question did not constitute merely a narrative of a judge's conduct in a particular case nor a general commentary upon his competence or his philosophy. Nor were they a plea for reform of the Texas legal system to the end that county court judges should be learned in the law and that a judgment in a suit of forcible detainer may be appealable. The thrust of the articles was directed to what the judge should do on a matter immediately before him, namely to grant a motion for a new trial. So the Texas Court found. And it found this not in the abstract but on the particular stage of the happenings and in the circumstances disclosed by the record. The Texas Court made its findings with reference to the locality where the events took place and in circumstances which may easily impart significance to the Texas Court but may elude full appreciation here.

Corpus Christi, the locale of the drama, had a population of less than 60,000 at the last census, and Nueces County about 92,000.   The three papers which published the articles complained of are under common control and are the only papers of general circulation in the area.   It can hardly be a compelling presumption that such papers so controlled had no influence, at a time when patriotic fervor was running high, in stirring up sentiment of powerful groups in a small community in favor of a veteran to whom, it was charged, a great wrong had been done. It would seem a natural inference, as the court below in effect found, that these newspapers whipped up public opinion against the judge to secure reversal of his action and then professed merely to report public opinion.   We cannot say that the Texas Court could not properly find that these newspapers asked of the judge, and instigated powerful sections of the community to ask of the judge, that which no one has any business to ask of a judge, except the parties and their counsel in open court, namely, that he should decide one way rather than another.   Only if we can say that the Texas Court had no basis in reason to find what it did find, can we deny that the purpose of the articles in their setting was to induce the judge to grant a new trial.   Surely a jury could reach such a conclusion on these facts.   We ought not to allow less leeway to the Texas Court in drawing inferences than we would to a jury.   Because it is a question of degree, the field in which a court, like a jury, may "exercise its judgment is, necessarily, a wide one."   Mr. Justice Brandeis in *Schaefer* v. *United States,* 251 U. S. 466, 483.   Of course, the findings by a State court of what are usually deemed facts cannot foreclose our scrutiny of them if a constitutional right depends on a fair appraisal of those facts.   But it would be novel doctrine indeed to say that we may consider the record as it comes before us from

a State court as though it were our duty or right to ascertain the facts in the first instance. A State cannot by torturing facts preclude us from considering whether it has thereby denied a constitutional right. Neither can this Court find a violation of a constitutional right by denying to a State its right to a fair appraisal of facts and circumstances peculiarly its concern. Otherwise, in every case coming here from a State court this Court might make independent examination of the facts, because every right claimed under the Constitution is a fundamental right. The "most respectful attention" which we have been told is due to a State would then be merely an empty profession. See *Pennekamp* v. *Florida,* 328 U. S. 331, 335.

If under all the circumstances the Texas Court here was not justified in finding that these publications created "a clear and present danger" of the substantive evil that Texas had a right to prevent, namely the purposeful exertion of extraneous influence in having the motion for a new trial granted, "clear and present danger" becomes merely a phrase for covering up a novel, iron constitutional doctrine. Hereafter the States cannot deal with direct attempts to influence the disposition of a pending controversy by a summary proceeding, except when the misbehavior physically prevents proceedings from going on in court, or occurs in its immediate proximity. Only the pungent pen of Mr. Justice Holmes could adequately comment on such a perversion of the purpose of his phrase.

Changes are rung on the remark of Mr. Justice Holmes in the *Toledo* case that "a judge of the United States is expected to be a man of ordinary firmness of character . . . ." 247 U. S. at 424. But it is pertinent to observe that that was said by an Olympian who was so remote from the common currents of life that he did not

read newspapers. Even a conscientious judge not a layman, and not merely one serving under a short judicial tenure, may find himself in a dilemma when subjected to a barrage pressing a particular result in a case immediately before him. He may not unnaturally be moved to do what is urged, or he may be impelled to display his independence and not give to the arguments on behalf of the motion for a new trial that serene and undisturbed consideration which often leads judges to grant such a motion. It has not been unknown that judges persist in error to avoid giving the appearance of weakness and vacillation. Thus, one or another of the litigants before the Court may have been denied that disinterested exercise of judgment which is of the essence of the judicial process. The demands found to have been made upon the judge by these papers may agitate even a conscientious judge. He may himself be unaware of the extent to which his powers of reason have not the sway they would otherwise have. Or a judge, proud of his independence, may unconsciously have his back stiffened, and thereby his mind, when hearing the motion for a new trial and passing on its validity. Judges are not merely the habitations of bloodless categories of the law which pursue their predestined ends.

The fact that it cannot be demonstrated how the delicate balance of an adjudication was tampered with, or whether it was, does not prove that it was not tampered with. To rely on the assumption that judges are men of fortitude and that no judge "worthy of the name" would be influenced in his decision by a publication directed toward a particular disposition of a pending litigation, is to say in effect that the Due Process Clause precludes a State from believing that there may be such a psychological danger, short of the fantastic situation where a judge confesses that he decided as he did because of newspaper

pressure, or avows that he came awfully close to being derelict in his judicial duty because of such pressure. In *Bridges* v. *California,* 314 U. S. 252, this Court did not profess to make a constitutional dogma of so questionable a psychological assumption. It did not condemn outright the power of a State summarily to punish for contempt a publication uttered outside of court but brought to bear upon a pending case. The opinion of the Texas Court gives every indication of scrupulous obedience to the requirements of the *Bridges* case. Nor did the dissenting judge find conflict with the *Bridges* case. If we accord "most respectful attention" to what the State court has decided, I am unable to find any ground for rejecting the application which the Texas Court made to the circumstances of this case of the principles which it drew from the *Bridges* case.

Is it conceivable that even the most doctrinaire libertarian would think it consonant with the impartiality which adjudication presupposes to publish a poll regarding the outcome desired by a community in a pending case? How can the insertion into the scales of justice of a newspaper's own notion of the desire of a community for a particular result in a pending case be more permissible than the report of public feeling as ascertained by a public poll? Again, suppose the newspaper articles here in controversy had been enclosed in a letter to the judge urging, on the basis of these articles, a new trial. Would the Constitution of the United States forbid a State to deal with such conduct through the corrective process of contempt? But a denial of this power to the States where newspapers carry the same articles directed to the same end can only be on the basis that private correspondence has less constitutional protection than have newspapers.

To agree with a principle in principle only to depart from it in practice has not been so fruitful of good in the

world of diplomacy as to suggest its importation into the judicial process. If it be deemed that the Due Process Clause put an end to the historic power of States to allow summary proceedings for contempt by interference with an actually pending controversy, or even if it be deemed offensive to due process for the judge whose conduct is called in question to sit in judgment upon the contemnor because self-interest is too great, see *Tumey* v. *Ohio*, 273 U. S. 510, and *Cooke* v. *United States*, 267 U. S. 517, 539, such a break with the past had best be completely candid. It may well be the deeper wisdom to treat with intelligent neglect paragraphs that are calculated and intended to influence the disposition of litigation. But the wisdom of such wisdom is not the measure of the constitutional power of the several States to deal with extraneous influence designed to affect the outcome of a particular case.

We think the judgment should be affirmed.

MR. JUSTICE JACKSON, dissenting.

This is one of those cases in which the reasons we give for our decision are more important to the development of the law than the decision itself.

It seems to me that the Court is assigning two untenable, if not harmful, reasons for its action. The first is that this newspaper publisher has done no wrong. I take it that we could not deny the right of the state to punish him if he had done wrong and I do not suppose we could say that the traditional remedy was an unconstitutional one.

The right of the people to have a free press is a vital one, but so is the right to have a calm and fair trial free from outside pressures and influences. Every other right, including the right of a free press itself, may depend on the ability to get a judicial hearing as dispassionate

and impartial as the weakness inherent in men will permit. I think this publisher passed beyond the legitimate use of press freedom and infringed the citizen's right to a calm and impartial trial. I do not think we can say that it is beyond the power of the state to exert safeguards against such interference with the course of trial as we have here.

This was a private lawsuit between individuals. It involved an issue of no greater public importance than which of two claimants should be the tenant of the "Playboy Cafe." The public interest in the litigation was that dispassionate justice be done by the court and that it appear to be done.

The publisher had a complete monopoly of newspaper publicity in that locality. For reasons that are not apparent, the papers took an unusual interest in the proceeding. They first made what the court agrees was a "rather sketchy and one-sided report of a case." This is not overstatement. The former tenant had tendered a check and the newspaper report represented it as a payment of rent; it made no reference to the fact that the check was postdated and was therefore no payment at all. Reports played up the fact that its favorite among the litigants was a veteran. The community became aroused. Then the newspaper published editorials which attacked the judge while a motion for retrial was pending with what the prevailing opinion concedes was "strong language, intemperate language, and, we assume, an unfair criticism." The object of the publicity appears to have been to get the judge to reverse himself and to grant a new trial.

The fact that he did not yield to it does not prove that the attack was not an effective interference with the administration of justice. The judge was put in a position in which he either must appear to yield his judgment to public clamor or to defy public sentiment. The consequence of attacks may differ with the temperament of the

judge. Some judges may take fright and yield while others become more set in their course if only to make clear that they will not be bullied. This judge was evidently of the latter type. He was diverted from the calm consideration of the litigation before him by what he regarded as a duty to institute a contempt proceeding of his own against his tormentors.

For this Court to imply that this kind of attack during a pending case is all right seems to me to compound the wrong. The press of the country may rightfully take the decision of this Court to mean indifference toward, if not approval of, such attacks upon courts during pending cases. I think this opinion conveys a wrong impression of the responsibilities of a free press for the calm and dispassionate administration of justice and that we should not hesitate to condemn what has been done here.

But even worse is that this Court appears to sponsor the myth that judges are not as other men are, and that therefore newspaper attacks on them are negligible because they do not penetrate the judicial armor. Says the opinion: "But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate." With due respect to those who think otherwise, to me this is an ill-founded opinion, and to inform the press that it may be irresponsible in attacking judges because they have so much fortitude is ill-advised, or worse. I do not know whether it is the view of the Court that a judge must be thick-skinned or just thickheaded, but nothing in my experience or observation confirms the idea that he is insensitive to publicity. Who does not prefer good to ill report of his work? And if fame—a good public name—is, as Milton said, the "last infirmity of noble mind," it is frequently the first infirmity of a mediocre one.

From our sheltered position, fortified by life tenure and other defenses to judicial independence, it is easy to say that this local judge ought to have shown more fortitude in the face of criticism. But he had no such protection. He was an elective judge, who held for a short term. I do not take it that an ambition of a judge to remain a judge is either unusual or dishonorable. Moreover, he was not a lawyer, and I regard this as a matter of some consequence. A lawyer may gain courage to render a decision that temporarily is unpopular because he has confidence that his profession over the years will approve it, despite its unpopular reception, as has been the case with many great decisions. But this judge had no anchor in professional opinion. Of course, the blasts of these little papers in this small community do not jolt us, but I am not so confident that we would be indifferent if a news monopoly in our entire jurisdiction should perpetrate this kind of an attack on us.

It is doubtful if the press itself regards judges as so insulated from public opinion. In this very case the American Newspaper Publishers Association filed a brief *amicus curiae* on the merits after we granted certiorari. Of course, it does not cite a single authority that was not available to counsel for the publisher involved, and does not tell us a single new fact except this one: "This membership embraces more than 700 newspaper publishers whose publications represent in excess of eighty per cent of the total daily and Sunday circulation of newspapers published in this country. The Association is vitally interested in the issue presented in this case, namely, the right of newspapers to publish news stories and editorials on cases pending in the courts."

This might be a good occasion to demonstrate the fortitude of the judiciary.