SPECTOR, Judge.
This is an appeal from an order adjudging the appellants to be in contempt of court for engaging in conduct imminently tending to interfere with the fair and orderly administration of justice. Subsequent to the entry of the Circuit Judge’s order, judgment, and sentence, appellants’ motion for bail pending appeal was denied and this Court refused to disturb the Trial Judge’s denial of bail by our opinion reported at 205 So.2d 691.
The overt acts upon which the Trial Judge based his contempt order were the physical distribution by the appellants of a crudely mimeographed circular or handbill within the Alachua County Courthouse at a place immediately adjacent to the room wherein the grand jury was deliberating a matter regarding which the appellants were the complaining party. Specifically, the matter being investigated by the grand jury was a complaint that police officers were having improper relations with female prisoners at the jail. The pertinent portions of the matter handed out are as follows :
“The so-called authorities of Gaines-ville are at their old trick again. They *121 have called together a grand-jury to investigate charges made by black people against that racist, klan-infested police department. Well, gather round, let me tell you this; that grand-jury is just as racist and klan infested as the police department is. I told you before that when they got through lying, fixing, framing, and denying — nothing was going to be done! Look who’s sitting on the jury. What they will probably do is put in a couple of Uncle Toms to make their findings justifiable. If there are any Uncle Toms on that grand-jury, we all know who they will be.
“By them housing female prisoners in the county jail is not going to solve the issues; just one of them. In the meantime that sadist Wilderson gets off scott-free. -And Ted Duncan — I don’t have to tell you about that Negro-hating hunkie, I think you already know. And Ex-May- or McKinney — He’s worse. A lying, no-good, racist if I ever saw one. He reminds me of ‘Bull’ Conner.
“There are people who are going to be subpoenaed to come to this fixed grand-jury, including myself. Many people are afraid to go — which shows WHITE POWER again. WE ARE ASKING THAT EVERYONE IN GAINES-VILLE WHO IS MAN AND WOMAN ENOUGH TO STAND UP AND FIGHT AGAINST THIS OPPRESSIVE CITY AND COUNTY GOVERNMENT COME FORWARD AND TESTIFY ON MONDAY, DECEMBER 18, at 9:30 A.M. By the way, where are those so-called Negro-leaders in Gaines-ville. You know these things have been going on, but you are afraid to stand up. So stay in your chairs, we know you are a part of white oppression.”
In support of the Trial Judge’s finding that appellants’ actions were calculated and intended to interfere with the administration of justice and created a clear and present danger to the administration of justice, the order appealed recites that the statements distributed immediately adjacent to the room where the grand jury was deliberating and in the corridor where witnesses were awaiting their turn to testify were of such nature that they could reasonably influence the testimony which might be given before the grand jury by the waiting witnesses. Moreover, the Trial Judge seemed to believe that the recitation in the mimeographed matter concerning the incidents under investigation reasonably could have a bolstering effect upon the uniformity of the witnesses’ testimony as they appeared before the grand jury.
The Trial Judge further found that the appellants’ reference to “Uncle Toms” in the above quoted excerpt from the circular constituted a veiled threat to those members of the grand jury who were of the Negro race. Our consideration of this racist tactic by appellants in the circumstances presented here would lead all but those with a myopic viewpoint to conclude, as did the Trial Judge, that if those members of the grand jury who were so crudely singled out did not vote out a presentment in accordance with the appellants’ desire, the censure of the Negro community would be suffered by those daring to defy their dictate.
For reversal appellants contend that the activities admittedly engaged in by them come under the protective cover of the First and Fourteenth Amendments to the United States Constitution relating to freedom of speech and press as construed by the United States Supreme Court in Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546; and Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569. Our examination of these cases fails to persuade us that they are controlling in the case at bar. As we state in our earlier consideration of the bail aspects of this case in Dawkins, supra, 205 So.2d at page 694:
“It can readily be seen therefore that the case before us concerns itself not *122 merely with criticism of a public official or body, but rather conduct calculated and tending to influence a grand jury and prospective witnesses awaiting their turn to testify under circumstances wherein there exists a clear and present danger that such influencing effect logically could result. Appellants’ intent that their written utterances bring about grand jury action satisfactory to them is manifest not only in the rhetoric chosen, but by the place and manner of distributing them. On the record and arguments before us, this seems to be the basis of the trial judge’s contempt order; not mere criticism of the kind found in Pennekamp and Wood, supra.”
Efforts to influence a grand jury in its deliberations respecting specific matters under investigation by it are not shielded by the constitutional right of free speech. In Sloan v. Brown, 114 Fla. 739, 154 So. 514, our Supreme Court held that the appellant was properly held to be in contempt of court for approaching a member of the grand jury and asking him to “look out for him * * * in any matters to be investigated by the Grand Jury that might involve him * * 154 So. at page 514. We see no significant difference between oral and written communications directed to one or more members of a grand jury where such communication is made with the intent and purpose to influence the outcome of the grand jury’s deliberations.
To determine the correctness of the Trial Judge’s holding that the conduct here in question, occurring as it did in the immediacy of the grand jury’s deliberations, had as its intent and purpose the influencing of that body’s deliberations, we need only to examine the transcript of testimony given by members of the grand jury pursuant to an order of the United States District Court for the Northern District of Florida in Tallahassee Civil Action No. 1384, which transcript was made a part of the record before us since the parties were the same in each case, and each case arose out of the same set of facts. Further, the cases essentially involved the same subject matter and the appellants herein made specific reference to this action in their collateral federal action, their counsel being the same in both actions. See Austin v. Mt. Zion Primitive Baptist Church of West Palm Beach, 165 So.2d 412 (Fla.App.2d 1964).
Examination of the transcript of the grand jurors’ testimony convinces us, as it did the learned Federal District Judge, that the nature of the offense of which these appellants stand convicted is such as to create a real and present danger to the administration of justice. The transcript shows that the members of the grand jury actually came into possession of the mimeographed circular labeled “Black Voices.” Testimony of some of the- grand jurors was as follows:
“Q. And when you read it, * * * what effect it had on you?
A. * * * It startled me. * * *
* ‡ * if. íjí
“A. I was startled, because it intimidated me. I felt it was a threat to me as a Grand Juror when we had hardly even opened the session. It frightened me, frankly.
Q. Can you elucidate * * * other reactions or impressions the publication had upon you?
A. * * * the threat and intimidation that I got from this — throughout the entire session of the Grand Jury.
Q. * * * did you feel that the publication had any effect upon your ability to make an unbiased determination of the issues that were to be determined by you ?
A. Yes, sir, it did.

“A. It affected me. It affected the way in which I operated as a Grand Juror throughout the entire case. It affected *123 the final presentment, as far as I was concerned, and the presentment which I voted for.”
Another Grand Juror:
“Q. What effect, if any, did the reading of that instrument have upon you as a Grand Juror?
A. It upset me when I first read it, and to feel like that here I was, * * *
******
“A. Well, first, they didn’t know me, and yet they were accusing me first of being a liar and of being fixed; and they were intimidating the Jurors on the whole, especially the colored members of the Jury.”
Another Grand Juror:
“Q. What effect did it have on you?
A. Well, it was an insult to me, as well as a kind of veiled threat that if we did not find to suit them that they knew who we were and implied that things may happen.”
The foregoing excerpts from the testimony of the grand jurors certainly are supportive of the Trial Judge’s view that the appellants’ conduct had as its purpose the interfering with the grand jury’s deliberations. His judgment that appellants’ conduct in the circumstances here presented was likely to interfere with and obstruct the process of a duly constituted grand jury then investigating both broad and specific matters relating to law enforcement in Alachua County, Florida, was certainly borne out by the testimony of the grand jurors.
Appellants’ persistence that the matter before us is fraught with First Amendment considerations fails to impress us. We are not here confronted with the publication of thoughts and opinions about a matter of general public interest as was the case in Wood v. Georgia, supra, wherein the Supreme Court was concerned with a broad inquiry as to bloc voting and alleged corrupt election practices. There the circuit judges who had instructed the grand jury as to the object of its investigation were said by Sheriff Wood to have needlessly precipitated a political issue with racial overtones in the midst of an election campaign then in progress and in which Wood was a candidate. Wood first issued a statement to the newspapers from his office in the courthouse in which he critized the judges' actions for instructing the grand jury as they did and further urged the citizens of the community to note that high judicial officers were in his opinion threatening political intimidation under the guise of law enforcement. The gravamen of the offense in Wood was the criticism of the judges who had instructed the grand jury. The trial court erroneously held that the mere publishing of the news release constituted the contempt by Wood, and that such publication of criticism of the judges constituted a clear and present danger to the administration of justice. No findings were made by the trial court in the Wood case. No reason was given there as to why the conduct complained of constituted a clear and present danger to the administration of justice.
In contrast, however, ample findings were made by the Trial Judge in the case at bar and sound reasons were stated for his conclusion that the conduct of the appellants posed a clear and present danger to the orderly administration of the grand jury function. Moreover, and quite fortuitously, the record before us as developed and expanded after appellants sought refuge in the federal court demonstrates quite clearly that the members of the grand jury were intimidated and their deliberations were influenced by appellants’ efforts to bring about a result satisfactory to them.
We are not unacquainted with the wide latitude which has been accorded our citizenry to speak their minds under the protective cover of the First Amendment, and this is as it should be. No judicial officer should be permitted to resort to the power to hold one in contempt as a device *124 by which to stifle criticism or fair comment on the manner in which his judicial labors are performed. As was held in Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295, the exercise of judicial power to punish for contempt within the context of First Amendment rights must be measured against a standard earlier described by the Supreme Court in Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, as a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before an utterance, oral or written, may be punished.
We hold, when measured against the standard articulated by the highest court of the land, that the Trial Judge correctly found that the conduct of appellants in the circumstances here presented was such as to seriously prevent the grand jury from discharging their duties free from interference by, and intimidating influences of appellants’ efforts to affect the deliberations of the grand jury. The evidence presented by the record before us does, in our opinion, furnish a rational basis for the Trial Judge’s characterization of the appellants’ conduct.
One cannot threaten, intimidate, bribe, or otherwise imminently seek to affect the outcome of grand or petit jury deliberations and then seek refuge in the First Amendment when held to account for his actions. One may well be critical of a judge or other public officer as was held in the Pennekamp, Craig, and Wood cases, supra, for:
“ * * * the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.” Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255.
Appellants’ conduct in the instant case was not that of mere criticism. Its equivalence to jury tampering is no less so because resort was had to a publication in the form of a mimeographed circular rather than words spoken furtively to the individual jurors.
Affirmed.
RAWLS, Acting C. J., and JOHNSON, J., concur.