**In re Michael STONE, Robert Knaus and Boulder Daily Camera, Respondents-Appellants.**

No. 82CA1260.

Colorado Court of Appeals, Div. III.

June 6, 1985.

Kelly, Haglund, Garnsey & Kahn, Edwin S. Kahn, Stephen H. Kaplan, Denver, special prosecutor-appellee.

Cooper & Kelley, P.C., Thomas B. Kelley, Denver, for respondents-appellants.

BERMAN, Judge.

Respondents, Michael Stone, Robert Knaus and the *Boulder Daily Camera*, appeal from a judgment holding them in contempt of court pursuant to C.R.C.P. 107 for contacting prospective jurors in a then pending criminal case. We affirm.

This contempt of court action arose out of a 1982 criminal trial then pending in Boulder District Court. The defendant in that criminal action had been charged with first degree murder, conspiracy to commit first degree murder, and second degree kidnapping. There had been substantial pretrial publicity, and the district attorney was seeking the death penalty in the event the defendant was convicted of a class 1 felony.

The jury selection process began on February 8, 1982, with members of the jury venire being preliminarily qualified on issues concerning the death penalty, pretrial publicity, and hardship. This voir dire was conducted on an individual basis in a conference room behind the courtroom. In addition to the venire person, the trial court judge, prosecutor, defense attorney, defendant, and various reporters were present.

The entire jury venire, prior to the individualized voir dire, was ordered by the court not to discuss with anyone nor permit anyone to discuss with them any subject concerning the pending case. This admonition was repeated at the noon recess.

During the individualized voir dire, prospective jurors, seated at the same table as defendant, were asked their views about putting him to death. The respondents, following complaints from citizens concerning what was perceived by some as intimidation tactics, proceeded to contact four members of the jury venire who had been preliminarily qualified in order to determine if they had been intimidated by the defendant's presence and the death penalty voir dire.

After these contacts were brought to the attention of the trial court on February 16, 1982, the 14 jurors who had been preliminarily qualified were questioned and dismissed. As a result, it was necessary to begin the jury selection process over again. Thereafter, the trial court, the prosecutor, and the defense attorney jointly filed this contempt motion. Because of potential conflicts, a special prosecutor was appointed to handle the contempt motion. In addi-

tion, a different judge heard the contempt motion.

The trial court found that respondents Stone and Knaus, and another respondent, Chance Connor, had known of the February 8, 1982, order which precluded prospective jurors from talking to anyone, including the media, about the case. Connor, however, was dismissed from the contempt action after the special prosecutor's case-in-chief.

The trial court further found that one venire person was asked by Connor if she felt "intimidated about having [defendant] in the same room with you." Stone asked another prospective juror, "How do you feel about being across the table from [the defendant]?" A third venire person was questioned by Stone about her feelings of "being in the same room with the defendant." All of the jurors contacted refused to answer any questions or in any other way discuss the case.

Although the court found that the respondents did not intend to interfere with the administration of justice, it found that their conduct "was volitional and committed when they knew their conduct was wrongful."

The trial court concluded that the respondents' First Amendment rights had not been violated, and that they were in contempt of court. The court did not impose any punitive sanctions, but ordered the respondents jointly and severally to reimburse the parties and the state judicial department for costs of four additional days of the criminal trial, and to pay the attorney fees and costs incurred by the special prosecutor in prosecuting this contempt motion.

## I.

■ This appeal requires us to balance First Amendment rights of free speech and free press against the Sixth Amendment right to a fair and impartial jury trial. Respondents argued that the trial court erred in refusing to apply the "clear and present danger" standard to their communications with members of the jury venire.

The "clear and present danger" test requires that "the substantive evil ... be extremely serious and the degree of imminence extremely high before utterances can be punished." *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). The trial court concluded that the clear and present danger standard did not apply here. We agree.

The United States Supreme Court cases cited by respondents which applied the clear and present danger test concerned instances of editorial comment or public expression of ideas. *See Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); *Pennekamp v. Florida,* 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); *Bridges v. California, supra.* But, no Supreme Court case has applied the clear and present danger standard under circumstances in which representatives of the communications media have contacted preliminarily qualified jurors.

We are not confronted here with a "pure speech" case, but rather with circumstances in which the press, through its news gathering activities, has engaged in conduct which seriously threatened to interfere with a defendant's due process rights to receive a trial by an impartial jury free from outside influences. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

■ It is the duty of the trial court to take necessary steps to protect the trial process from prejudicial outside interferences. *Sheppard, supra.* Here, the trial court did not prohibit media access to the individual voir dire of the prospective jurors, and thus, this is not a case involving the denial of the press' right to access. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Respondents were free to listen to the answers given by jurors in response to defense counsel's questions regarding the death penalty and were not

precluded from publishing news accounts concerning their observations.

The trial court, however, did take steps to protect the impartiality of the jurors by instructing them, in the respondents' presence, not to discuss the case with anyone. Nonetheless, respondents, in knowing conflict with the trial court's order, sought and did contact potential jurors to question them about their reaction to the voir dire procedure.

■ We agree with the trial court that, once the trial process had begun, respondents' First Amendment rights did not extend to permit communication with prospective jurors who had been admonished not to discuss the pending case. It is at this point, as the trial court aptly concluded, that "the risk of prejudice to the fair administration of justice is so high if such conduct were permitted ... that any benefit to be derived by the public from the publication of the jurors' views is overridden."

The fact that all the prospective jurors contacted by the respondents indicated that the contact did not affect their ability to be impartial jurors is not dispositive. See Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). See also Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction."). At the contempt hearing respondent Knaus admitted the possibility that the questions posed could have the affect of putting in a juror's mind the thought that maybe the juror should be intimidated by the defendant.

## II.

Having determined that the trial court properly held that respondents' First Amendment rights were not violated, we address the respondents' contention that the trial court erred in concluding that an intent to interfere with the administration of justice is not required to support a finding of contempt. We perceive no error.

■ Although C.R.C.P. 107 is entitled "Civil Contempt," the rule "clearly includes a definition encompassing, and procedures governing, both civil and criminal contempt...." People v. Razatos, 699 P.2d 970 (1985) (fn. 1); see People v. Barron, 677 P.2d 1370 (Colo.1984). Indeed, C.R. C.P. 107 provides in pertinent part that "interference with any lawful writ, process, order, rule, decree, or command of said court ... shall constitute contempt."

■ Contrary to respondents' assertion, intent to interfere with the administration of justice is not required for a contempt finding. Rather, the contemner's intent is a guide to be used by the trial court in exercising its discretion to punish. See Lobb v. Hodges, 641 P.2d 310 (Colo.App. 1982).

■ Here, sufficient evidence was presented from which the trial court could conclude that the respondents knew that the preliminarily qualified jurors were precluded from talking to anyone, including members of the media, about the case; that the respondents' conduct in contacting the jurors despite this knowledge was "volitional and committed when they knew their conduct was wrongful"; and that the respondents' conduct was contemptuous because they "knowingly interfered with the lawful Order of the court and that misbehavior was of such a character as to obstruct the administration of justice" and offend the dignity of the court. Accordingly, the contempt finding will not be disturbed on review. Page v. Clark, 197 Colo. 306, 592 P.2d 792 (1979).

## III.

We perceive no error in the trial court's imposition of damages and attorney fees in this case.

As we noted previously, criminal contempt proceedings may be conducted under

the provisions of C.R.C.P. 107. *People v. Razatos, supra.*

C.R.C.P. 107(d) provides:

"The court shall hear the evidence for and against the person charged and it may find him guilty of contempt and by order prescribe the punishment therefor. *A fine may be imposed not exceeding the damages suffered by the contempt, plus costs of the contempt proceeding, plus reasonable attorney's fees in connection with the contempt proceeding, payable to the person damaged thereby.* If the contempt consists of the failure to perform an act in the power of the person to perform he may be imprisoned until its performance. In addition thereto, to vindicate the dignity of the court, if the citation so states, a fine or imprisonment may be imposed. If any such fine is not paid the court may order the contemner imprisoned until payment thereof." (emphasis supplied)

Hence, C.R.C.P. 107(d) provides for two categories of contempt, dependent on the purpose and character of the sanctions sought to be imposed.

"Civil contempt proceedings are remedial in nature and are not intended to punish the contemner or to deter offenses against the public .... In contrast, criminal contempt proceedings are designed to preserve the power and vindicate the dignity of the court by imposing punishment on the contemner."

*People v. Razatos, supra.*

Here, although the trial court referred to the sanctions as "remedial," it did not impose remedial or punitive sanctions as described in the latter portions of C.R.C.P. 107(d). Rather, the court required respondents to reimburse the parties for the quantifiable costs of four additional days of the criminal trial, and to pay the attorney fees and costs incurred by the special prosecutor in prosecuting this contempt motion. These sanctions were within the court's authority under the language of C.R.C.P. 107(d) permitting the imposition of a fine up to the amount of "the damages suffered by the contempt, plus costs of the contempt proceeding, plus reasonable attorney fees in connection with the contempt proceeding ...." Thus, they will not be disturbed on review.

Judgment affirmed.

BABCOCK and METZGER, JJ., concur.