Application of J. NORMAN STONE for admission to the Bar of the State of Wyoming.

The State of Wyoming, upon relation of the Attorney General, George F. Guy and Assistant Attorney General, Bruce P. Badley, Edward Birchby, President of the Sheridan County Bar Association and G. R. McConnell, Attorney at Law,

*Plaintiff*

vs.

J. NORMAN "STONEY" STONE,

*Defendant.*

(No. 2772; January 7, 1957; 305 Pac. (2d) 777)

4

Honorable George F. Guy, Attorney General, Bruce P. Badley, Assistant Attorney General, both of Cheyenne, Wyoming, G. R. McConnell of Laramie, Wyoming, Edward Birchby and Henry A. Burgess, both of Sheridan, Wyoming appeared for the Plaintiff.

Mr. John J. Spriggs, Sr., of Lander, Wyoming, appeared for the defendant, and the defendant was also present.

Mr. William J. Wehrli of Casper, Wyoming, Mr. Joseph H. Galicich of Rock Springs, Wyoming, Mr. Thomas O. Millerof Lusk, Wyoming, and Mr. Joseph J. Hickey of Cheyenne, Wyoming appeared amici curiae.

Heard before Blume, C. J. and Harnsberger and Parker, J. J.

## OPINION

Per Curiam.

Defendant stands charged with contempt in an action invoking the original jurisdiction of this court. The evidence discloses a long continuing, carefully planned attack on members of the supreme court, and we must now determine whether or not such acts constitute a direct contempt and whether they are a clear and present danger to the court and to the administration of justice in Wyoming. The charges in the petition relate only to acts and statements against this court. However, Art. 5, § 2, Constitution of Wyoming, provides that:

"The supreme court shall have * * * a general superintending control over all inferior courts * * *."

and the charges, therefore, indirectly concern all of this State's judiciary.

Defendant's improper conduct, as charged in the petition, began during the pendency of his application for reciprocal admission to practice law in this State, which matter was decided adversely to Mr. Stone in Application of Stone, 74 Wyo. 389, 288 P.2d 767 (certiorari denied by the United States Supreme Court by No. 38, Misc., October 8, 1956), and is res judicata insofar as this application is concerned.

For clarity and in order to provide factual background essential to the determination of the present legal problem, it is necessary to set out a chonological outline of relevant events, even though some of such matters were discussed in the case formerly decided.

Defendant, at the time named Jack N. Steinberg, came to Sheridan, Wyoming, in November 1954. After some two days there, he returned to Washington, D. C., where he had previously practiced law, changed his name by legal process to J. Norman Stone, and forwarded to this court a "Petition for Admission to the Bar without Examination." This matter was referred to the State Board of Law Examiners, the agency authorized by law to report to the supreme court touching the qualifications and moral character of persons seeking to practice law in Wyoming. Concurrently, defendant filed the usual "Application for Character Report" with the National Conference of Bar Examiners, the agency which makes investigations and furnishes information to the State Board of Law Examiners of Wyoming and most other states in the

union regarding persons applying for admission to practice law. Defendant in such application stated (as is required and customary), "I understand that I will not receive and am not entitled to a copy of the report nor to know its contents."

In the application the defendant disclosed the following facts, that:

(1) He had changed his name from Steinberg to Stone on November 30, 1954.

(2) He had refused to pay rent for an apartment occupied by him for some eighteen months and gave as the reason, "The management knew it was damp but did not divulge that fact to me * * *. Subsequently I became ill."

(3) He had sued fourteen different persons to recover fees for professional services; one for damages to him "as a result of food poisoning"; another for damages suffered in an automobile accident; three persons on promissory notes; and one on judgment creditor's action.

(4) The following actions had been brought against him in courts: (a) "Suit to Recover Rent," (b) "Complaint for Fraud and Deceit and/or Breach of Contract," (c) "Suit for Breach of Contract," (d) "Complaint for Libel," (e) "Complaint for Unlawful Attachment." Defendant claimed that all suits had been dismissed or settled, except one which was still pending trial.

(5) Five different complaints had been filed against defendant with the Committee on Admissions and Grievances of the Bar Association of Washington, D. C. Defendant gave his version of the facts surrounding each complaint, stating that each had been dismissed but admitting one had resulted in a reprimand.

The information resulting from the ensuing investigation merely *confirmed* what the application had *disclosed on its face*—that defendant was a troublemaker. This court in Application of Stone, supra, discussed some eighteen of defendant's past activities which we considered to be just cause why he ought not to practice law in this State. No useful purpose would be served by recapitulating or rediscussing such activities since the reported case is readily available.

Suffice to say that it is the firm conviction of the members of this court that no one shall ever be admitted to the Bar of this State unless this court is satisfied that he or she has an adequate knowledge of the standards and ideals of the profession and is otherwise a fit person to take the oath and perform the obligations and responsibilities of an attorney at law as well as possessing the requisite legal qualifications.

On August 3, 1955, five days *before* the State Board of Law Examiners filed its report with this court, defendant filed with the clerk a letter stating that he had been advised orally that he was not to be recommended for admission. His letter stated:

"If this be true, I respectfully request that I be so notified in writing and I further respectfully request that I be permitted to appear in open court before the Supreme Court of Wyoming so that I might present to said court overwhelming and cogent reasons supported by powerful and compelling evidence crying for my admission. I further respectfully request that I be permitted to subpoena all of the members of the aforesaid committee for purposes of examination under oath together with other witnesses favorable to me who will among other things testify to *execrable* practices of certain Sheridan lawyers living and *deceased.*" (Emphasis supplied.)

On August 8, 1955, the Board of Law Examiners

recommended in writing that the supreme court deny defendant's application for admission; and the court immediately entered an order granting defendant until September 10, 1955, to file "a statement in writing of his reasons why the recommendation of the State Board of Law Examiners should be overruled."

On August 13, defendant filed a "Demand for Jury Trial"; on August 18, a "Motion for Bill of Particulars," demanding a copy of the report and a specification of all charges; and on September 3, a "Request for Information" as to all applicants for the admission to the Wyoming bar since 1900. On October 5, he sent to this court a copy of his letter to "Attorney General Herbert T. Brownell" (copy of this letter was also addressed to each member of the court individually and, according to the notation on the letter, to twenty other persons or agencies) in which he stated:

"I indict the State Board of Law Examiners of Wyoming together with the Supreme Court of Wyoming with having fomented a conspiracy in concert to deprive me of my livelihood, willfully, knowingly, maliciously * * *."

On the same day, he wrote a letter to the clerk of this court, stating:

"I accuse the Wyoming Supreme Court of being unfair, prejudiced, partial and biased and am sure that I will not get a fair hearing unless the court permits a jury of good Wyoming people to hear it. The court is trying to bury me under a maze of legal technicality but the people of Wyoming can see through this hocus pocus."

Defendant failed to avail himself of the month-long opportunity provided by the court of stating reasons why the recommendation of the examiners should be overruled. Accordingly on October 18, 1955, the court

rendered its opinion, Application of Stone, supra.

Following the issuance of that opinion, defendant filed no application for rehearing, the remedy prescribed for litigants who are dissatisfied with decisions of the court. Instead, he sent to the court various writings, scurrilous and contumelious in nature, demanding that certain steps be taken by the court. Such demands not being in accordance with the authorized procedure before the court, they were, in each instance, denied. Defendant also at different times sent to the court copies of his advertisements in the "Sheridan Press" and, later, copies of his own publication, "Stone's Shooting Star." We herewith list the signed papers which he sent to the court following the opinion, Application of Stone, supra, and before the beginning of the present case:

(a) December 12, 1955, a twelve-page "Motion for Jury Trial * * * " and " * * * Authorities * * * "; (b) December 14, 1955, a six-page letter to the court; (c) February 23, 1956, "Motion for Leave to Argue * * * and for Disqualification of * * * Blume, Parker, and Harnsberger * * * " together with thirty-eight pages of "Motion * * *, " " * * * Affidavit * * *, " and "Addendum * * * "; (d) February 28, 1956, "Notice of Taking of Deposition of D. P. B. Marshall"; (e) March 8, 1956, "Motion to Compel * * * Marshall * * * to Submit to Deposition or be Adjudicated in Contempt * * *."

On September 20, 1956, defendant sent a "Petition de Novo" which was retained by the clerk.

These writings as well as copies of the advertisements and publications will be discussed later in this opinion and judgment as the occasion arises.

In September 1956 the petition in the present hearing on contempt was filed and in the interest of clari-

ty a chronology of the filings in this proceeding is here given:

(a) September 17, 1956, petition filed; (b) September 21, 1956, order to show cause issued; (c) October 5, 1956, defendant's "Motion to Dismiss," and order denying motion to dismiss; (d) October 10, 1956, "Motion of Appointment of Counsel * * * " and order denying said motion; (e) October 12, 1956, defendant's "Request for Grand Jury Session"; (f) October 16,, 1956, order denying request for grand jury session; (g) October 22, 1956, "Motion for Jury Trial * * *"; (h) October 23, 1956, order denying motion for jury trial; (i) October 24, 1956, defendant's "Request for Additional Thirty Days to File Answer," and order granting additional time for answer; (j) November 14, 1956, supplemental petition filed by plaintiff; (k) November 20, 1956, order setting cause for hearing; (1) December 4 and 5, 1956, hearing on cause.

Following this court's decision in Application of Stone, supra, defendant sought relief in the Federal court. The proceedings there are not directly related to the contempt charges but present an over-all account of the occurrences which are essential to a clear understanding of the general situation. His petition for mandamus was denied by the U.S. District Court for Wyoming, whereupon he appealed to the Court of Appeals for the Tenth Circuit, was there denied relief, and failed to appeal further.

From the first, defendant's denunciation of the court stemmed from his erroneous insistence that he had a *right* to practice law in any state he chose and if such right were denied him he should be permitted to demand reasons therefor and to have a jury pass upon

the matter. This was pointed up by the statement which he made in his letter to Attorney General Brownell in which he charged that this court had "fomented a conspiracy in concert to deprive me of my livelihood." It therefore came as a surprise that defendant's attorney in the instant hearing voluntarily stated as a part of objection and argument:

" * * * the Supreme Court of the United States has held that the right to practice law is a privilege and not a vested constitutional right; that, being a mere privilege, granting of that is in the exclusive jurisdiction of the State and that the Supreme Court [of the United States] has no jurisdiction at all on granting or revocation of a license to practice law."

This statement is, of course, correct under the general law and especially under § 2-109, W.C.S.1945, which provides that attorneys from other jurisdictions may be permitted to practice in Wyoming "in the discretion of the [Wyoming] supreme court." Defendant's present admission of the correctness of this legal principle—a complete reversal of position—cannot go unnoticed in any appraisal of the situation.

As far as this court has been able to discover, this contempt proceeding is the first of its kind in the history of this State. Moreover, we have been unable to find its parallel in any reported case from other jurisdictions. In consequence of the general powers conferred upon this court by the Constitution of Wyoming and in the light of Cooke v. United States, 267 U.S. 517, 536, 45 S.Ct. 390, 69 L.Ed. 767, this court deems that it has properly prescribed the proceedings which have been taken in this case, and that at each step defendant has been accorded his full constitutional and statutory rights to make a proper defense under the order to show cause to the charges of contempt against

him. Although defendant immediately prior to the hearing filed a written motion to dismiss and later orally reiterated it, he was not sufficiently interested in phases other than the violation of constitutional guaranties to present any authorities. The constitutional questions will be discussed at some length in this opinion, and we do not consider that the empty assertions of other claimed grounds for dismissal warrant our attention or discussion here.

Defendant throughout the hearing persistently urged that his utterances have all been within the protection afforded him by the First, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, and the "Bill of Rights" of the Wyoming constitution, in that his utterances have been made in the exercise of his right of free speech or free press. Defendant's counsel stated his belief that since 1925 the provisions made by the Congress of the United States and the constructions placed upon the First, Fifth ,Sixth, and Fourteenth Constitutional Amendments by the United States Supreme Court have so circumscribed and limited the right of judicial bodies to invoke contempt in the protection of their functioning that the occurrences complained of herein are not contempt, because they do not constitute a clear and present danger to the administration of justice.

We must make clear that we acknowledge the full right of the United States Supreme Court to interpret the provisions of our national Constitution, and that in interpreting the free speech and free press provisions of that document the Court has set certain guideposts for ascertainment of the limits within which free speech and free press must be contained in order to preserve the integrity and effectiveness of the courts in their administration of law and justice.

The problem before us then is first to define, as well as we may, the limited area which the Federal law and decisions have left untouched for necessary and inherent exercise of the prerogative of a state court to invoke the remedy of contempt to prevent interference with its functions.

As we understand the Federal decisions, the Court has been reluctant to demarcate with measurable certainty the exact limit of the area except as has been raised in specific cases presented to it. See Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; and Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095.

Mr. Justice Black in Bridges v. State of California, supra, at 314 U.S. 260, 271, specifically so stated, quoting Whitney v. People of State of California, supra, and further clarifying this:

"* * * free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them. * * *

 * * * *

"* * * We must therefore turn to the particular utterances here in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment."

Earlier, in Schenck v. United States, supra at 249 U.S. 52, Mr. Justice Holmes had said:

"* * * the character of every act depends upon the circumstances in which it is done. * * *"

With varying emphasis this view has been recog-

nized and enunciated. See Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546.

As we view the instant case, the charges against defendant are based primarily on writings which defendant has filed with this court, either by specifically requesting their filing or by mailing them to the clerk, thereby impliedly making such request. In many instances defendant simultaneously gave or sent to members of the public—often to news agencies and others through whom he thought he could secure the greatest coverage—copies of the instruments which he filed with the court. Such writings may, as exhibits in this case, be classified in three groups.

*First.* Those issued by defendant and sent to the court during the pendency of Application of Stone, supra, the first four mentioned having been received in evidence without objection.

(a) State's Exhibit 3, "Demand for Jury Trial," filed August 13, 1955.

(b) State's Exhibit 4, defendant's letter filed August 3, 1955.

(c) State's Exhibit 6, copyof defendant's letter to Attorney General Brownell.

(d) State's Exhibit 7, defendant's letter of October 5 to the clerk of this court.

(e) State's Exhibits 29, 30, and 31, tear sheets from issues of the Sheridan Press dated October 6, 12, 18, 1955, and each containing advertisement by defendant.

*Second.* Those issued by the defendant and sent to the court during the pendency of the instant contempt case.

(a) State's Exhibit 8b, defendant's "Petition de Novo" received by the court September 20, 1956.

(b) State's Exhibit 8d, defendant's letter of October 18, 1956.

(c) State's Exhibit 9, "Motion to Dismiss," filed October 5, 1956. (The instrument mentioned by defendant's counsel as containing the "apology".)

(d) State's Exhibit 11, defendant's "Motion for Appointment of Counsel * * *," filed October 10, 1956.

(e) State's Exhibit 13, defendant's "Request for Grand Jury Session," filed October 12, 1956.

(f) State's Exhibit 15, defendant's "Motion for Jury Trial * * *," filed October 22, 1956.

(g) State's Exhibit 17, "Request for Additional Thirty Days to File Answer," filed October 24, 1956.

(h) State's Exhibits 19, 20, 21, 22, 23, 24, issues of "Stone's Shooting Star" published weekly begining October 27, 1956, to the date of the hearing.

(i) State's Exhibit 28, tear sheet from the Sheridan Press dated October 10, 1956, containing defendant's advertisement.

*Third.* Those issued by the defendant and sent to the court *after* the decision in Application of Stone, supra (October 18, 1955), and *before* the filing of the present contempt case on September 17, 1956.

(a) State's Exhibits 25, 26, 27, tear sheets of the

Sheridan Press dated May 10, 21, June 5, 1956, each containing advertisement of defendant.

(b) State's Exhibits 32, 33, 34, 35, tear sheets of the Sheridan Press dated November 5, 16, 18, December 16, 1955, each containing advertisement of defendant.

We consider that the exhibits listed by us in the first and second groups are properly admissible as evidence in this case. Other exhibits offered consist principally of routine orders of this court, the proceedings in Federal courts, defendant's letter relating to his candidacy for district judge, and certain mailings of publications by defendant to this court. Some of these were admitted without objection, some were in effect stipulated, and some were admitted by the court at the close of the State's case after previously reserved rulings. We deem it advisable to here clarify our views regarding the admissibility of the evidence.

That listed by us in the first and second groups is admissible as relating to the offense charged. All other evidence is admissible solely as it relates to continuity and perspective of defendant's acts, the intent of defendant, and his present sincerity or lack of sincerity in the purported apology—not as to the gravamen of any offense charged.

A verbatim statement herein of the court's views as to the contemptuous nature of utterances by the defendant would be unnecessary as duplicating the judgment issued concurrently herewith and by reference hereby made a part of this opinion.

We turn now to a consideration of the merits of the case, i.e., whether or not the utterances made by the defendant are within the provisions of the Con-

stitution allowing freedom of speech and freedom of press, or whether his acts have transcended such freedoms and become either direct contempts inherently punishable by the courts in the proper maintenance of their functions or are otherwise contemptuous to the extent of constituting a clear and present danger to the administration of justice in Wyoming.

Initially, it may be said that the power to punish for contempt is inherent in all courts, and this authority has been so many times decided that it may be deemed as settled law. See generally National Lawyers' Manual "Contempt," p. 15; Ex Parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405; Ex Parte Robinson, 19 Wall. (U.S. 505, 22 L.Ed. 205; Eilenbecker v. District Court of Plymouth, 134 U.S. 31, 10 S. Ct. 424, 33 L.Ed. 801; Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186; and Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451.

In speaking on this subject, Mr. Justice Field in Ex Parte Robinston, supra at 19 Wall. (U.S.) 510, said:

"The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. * * *"

He continued by saying that the courts of the United States the moment they were called into existence and invested with jurisdiction over any subject became possessed of this power.

In passing it is significant to note two points in which the judiciary of the Federal government differs from that of most states—life tenure and restricted powers to cite for contempt. The tenure and the re-

strictions were undoubtedly reciprocally related in the thinking of our forefathers because (a) the Federal Constitution provided: "The judges, both of the Supreme and inferior courts, shall hold their offices during good behavior," Art. 3, § 1; and (b) the First Congress, convened after the day fixed for the operation of the new government but before the last state had ratified the Constitution, in 1 Stat. 83 (1789) passed a law restricting contempts before Federal courts to "any cause or hearing before the same." This provision has undergone some changes, in 1831 being amended to read, "That the power of the several courts of the United States to * * * inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice * * *." and subsequently amended to presently read:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; * * *" 62 Stat. 701 (1948), 18 U.S.C.A. § 401 (1950 ed.)

This Congressional restriction in whatever form it has been evolved could scarcely fail to exert an automatic inhibition upon Federal courts, often imperceptible, but nevertheless potent. This has undoubtedly been a major factor in molding the views of the Federal courts, even when they have been called upon to pass upon contempt matters arising in courts of a state in which there was no restriction of the power to punish for contempt, either constitutional or statutory;

and, perhaps, has been in part responsible for the numerous definitions of "direct contempt," "contempt in the presence of the court," and ramifications of that term.

By the weight of authority any type of contempt which is in the face of the court is punishable summarily as an improper interference. Ex Parte Terry, supra; Ex Parte Savin, 131 U.S. 267, 9 S.St. 699, 33 L.Ed. 150; In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682.

"* * * the requirements of due process are less strict in the case of direct contempt committed in the actual presence of the court than they are in the case of constructive contempt * * *." Annotation, 99 L.Ed. 892, 893.

It has been the view of the Supreme Court that direct contempts include even minor matters which are in the presence of the court. See Fisher v. Pace, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569, 573. In that case the contempt arose by reason of remarks made by counsel to the court after counsel had been limited as to remarks he might make to the jury. The court fully appreciating that the matter here was not in the class of a clear and present danger nevertheless said:

"Historically and rationally, the inherent power of courts to punish contempts in the face of the court without further proof of facts and without aid of jury is not open to question. This attribute of courts is essential to preserve their authority and to prevent the administration of justice from falling into disrepute. Such summary conviction and punishment accords due process of law."

See also Annotations, 93 L.Ed. 578 and 1151.

The view that direct contempts do not necessarily

deal with minor matters in the immediate presence of the court is indicated by the statement in Sacher v. United States, 343 U.S. 1, 12, 72 S.Ct. 451, 96 L.Ed. 717:

"* * * It cannot be that summary punishment is only for such minor contempts as leave the judge indifferent * * *."

Under the holdings of most courts, the writings which the defendant authored and placed with this court constitute direct contempt and are properly punishable as such.

In Cooke v. United States 5, Cir., 295 F. 292, the defendant caused a letter to be delivered to the judge in his chambers. The letter in effect stated that the judge had shown his prejudice against Cooke's client which would prevent the client receiving justice in future trials and asked the judge to disqualify himself, impliedly threatening a disqualification if he did not and containing matter personally derogatory to the judge In the opinion which considered the matter on appeal, Mr. Chief Justice Taft in 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed.767, held the letter was contemptuous and that the offense had been committed in the *presence of the court,* although not "in open court" so as to permit summary punishment *without a hearing.* He also took occasion to discuss the meaning of such words as "under the eye or within the view of the court," "in the face of the court," and "in facie curiae," and reversed and remanded the cause because it was not sufficiently in the actual view of the court to permit summary punishment *without a hearing.*

In Owens v. Dancy, 10 Cir. 36 F. 2d 882, 883, the defendant in pleading charged that:

"'* * * to determine this cause and decide the same

in the manner hereinbefore in this motion described, without judicial consideration and without the benefits of the briefs presented in said cause, and without the knowledge on the part of the justices participating in said decision of what was in the case—made upon which said causes both proceeded, was a legal fraud against the rights of these movants * * *'."

The circuit court held "this constituted contemptuous conduct in the presence of the court," and certiorari was denied by the United States Supreme Court, 281 U.S. 746, 50 S.Ct. 351, 74 L.Ed. 1158.

In People v. Parker, 396 Ill. 583, 72 N.E.2d 848, the defendant, charged with contempt, had filed as exhibits in the circuit court various documents denominated by the Illinois supreme court as "impertinent, insulting, malicious and scandalous charges against various judges" (the details of the exhibits are set out in People v. Parker, 328 Ill.App. 46, 65 N.E.2d 457). The United States Supreme Court affirmed a judgment of contempt in Parker v. People of State of Illinois, 333 U.S. 571, 68 S.Ct. 708, 92 L.Ed. 886.

In United States v. Huff, D.C.Ga., 206 F. 700, the court held that letters sent to the judge constituted a contempt.

In Fleming v. United States, 9 Cir. 279 F. 613, 615, appeal dismissed on motion of petitioner, 260 U.S. 752, 43 S.Ct. 10, 67 L.Ed. 496, an action for libel, at the time set for pleading defendant filed a petition and motion for change of venue, claiming among other things that the proceedings against him had been instituted with the connivance of the presiding judge. The court held that this was a "direct affront" to the court and that "summary inquiry and a record of the finding and punishment are all that are necessary to

constitute due process of law," and affirmed a conviction of contempt.

See also Froelich v. United States, 8 Cir. 33 F.2d 660, which discusses the right of a court to punish for contempt by reason of a letter to the United States Attorney making improper statements about a presiding judge. The court therein did not specifically hold that this was a direct contempt but held that it was contemptuous and implied that the contempt was direct.

The majority view among state courts is in accord with these Federal cases in holding that the filing of insulting and scurrilous letters or pleadings constitutes a contempt which is designated either "direct," "in the presence of the court" or by some other name designed to indicate the court's view of its authority to deal summarily with the very imminent danger to the continued administration of justice. A brief resume of some of these contempt cases provides information as to the specific writings which have over the years been so considered.

In McCormick v. Sheridan, 3 Cal. Unrep. 35, 20 P. 24, 25, the filing of an improper petition was held to be contempt "in the face of the court."

In State v. Waugh, 53 Kan. 688, 37 P. 165, the sending of a letter was held to be contempt.

Lamberson v. Superior Court of Tulare County, 151 Cal. 458, 91 P. 100, 11 L.R.A. (N.S.) 619, held that the filing of scandalous and improper papers was "in the immediate view and presence of the court."

In Coons v. State, 191 Ind. 580, 134 N.E. 194, 20 A.L.

R. 900, the material was handed to the judge in open court and this was held to be contempt.

In State v. Owens, 125 Okl. 66, 256 P. 704, 52 A.L.R. 1270, the court held that the filing of a scandalous motion was a direct contempt.

Blodgett v. Superior Court of Santa Barbara County, 210 Cal 1, 290 P. 293, 295, 72 A.L.R. 482, held that "points and authorities" filed in the support of a demurrer and containing inferable innuendo against the court constituted a direct contempt. It was also held in this case that a scandalous letter written to the court by the defendant during the contempt action also constituted direct contempt.

In re Caruba, 139 N.J.Eq. 404, 51 A.2d 445, 458, affirmed on appeal 140 N.J.Eq. 563, 55 A.2d 289, certiorari denied Ex Parte Caruba, 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396, held that a scurrilous letter addressed to the court was contempt "in facie curiae."

In People v. Richardson, 397 Ill. 84, 72 N.E.2d 851, the filing of a motion accusing the judge of signing false and untrue certifications of proceedings was held to be contempt.

In State v. Gussman, 34 N,J,Super. 408, 112 A.2d 565, 566, a person who had been given a ticket for speeding wrote to the judge of the municipal court stating that " 'it is manifestly futile for me to drive a hundred and twenty-five miles to attempt to establish my innocence. Hence, I shall not go to the trouble. This is, I realize the reason I was chosen for the shakedown.' " This sending of a letter was held by the court to be contempt.

A reading of the above cases discloses a great va-

riety of innuendo, insult, and other improper reference to officials of the courts by the respective defendants. However, it will be noted that in none of these cases was there a *continued* campaign of invective of the nature sent to this court by the defendant herein. Under the precedent of both United States and state courts, it seems clear that the letters, motions, and other pleadings, as well as the papers and advertisements filed by defendant with this court, constitute *direct contempt* and are properly punishable.

Even though the utterances of defendant should be held to be constructive rather than direct contempts, we think those statements of defendant filed in this court during the pendency of Application of Stone, supra, are contemptuous and properly punishable. Undoubtedly, his counsel has misconceived the holdings of the Supreme Court cases which discuss the clear and present danger doctrine. He insists that these cases grant him entire immunity for whatever statements he may have made, whether libelous or not, and that the only remedy which this court or its members has is a resort to libel or slander action. (There seems some confusion as to whether "libel" or "slander" was intended to be used by counsel.) We do not interpret Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L. Ed. 192; Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546.

Schenck v. United States, supra, related to distribution of leaflets claimed by the Government to be a part of espionage charged against defendant; and Mr. Justice Holmes in delivering the majority opinion of

the court, affirming a conviction, indicated that there must exist a clear and present danger that defendant's action will bring about an evil—in that case espionage —in order to outweigh Constitutional guaranties.

Gitlow v. People of State of New York, supra, was an indictment for the crime of anarchy in which it was charged that defendant circulated pamphlets urging the overthrow of the Government by force and violence. Mr. Justice Holmes pointed out the fact that in his opinion there did not actually exist a present danger to the Government in the light of all the then existing circumstances (this was in 1925) and recalled the statement that he had made in the Schenck case:

" 'The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that [the state] has a right to prevent.' "

In these two cases there was no question of contempt before the court.

In Bridges v. State of California, supra, defendants were found guilty of contempt because, severally, a newspaper published allegedly improper editorials and a party to an action sent an allegedly improper telegram. Neither the newspaper editorials nor the telegram was sent to or filed with the court in which the case was pending.

In Pennekamp v. State of Florida, supra, there was a conviction for contempt because of writings and cartoons published in a newspaper regarding a pending case. The materials were not sent to nor filed with the court as constituting an attempt to influence it. Craig v. Harney, supra, related to contempt occasioned

by a newspaper publication criticizing the court for action in a pending case. No copy was filed with the court.

This brief reference to some of the leading clear and present danger cases clearly spotlights the fact that the Court in applying that doctrine has heretofore, as far as contempt is concerned, dealt either with a legitimate newspaper expressing an honest opinion over a brief period of time during the trial of a case or the criticism of a litigant who, more or less as a reflex action, has indulged in criticism of a court's order; but in no instance was direct contempt committed.

In no case in which the United State Supreme Court has discussed the clear and present danger doctrine has there been an instance similar to that now being considered, where there has been a sustained, continuous, and planned attack by a person professing to be learned in the law (and an aspirant to be admitted as such) against a court and its members with the apparent intention of villifying and degrading the judiciary of a state by false, vicious, and malicious propaganda calculated to besmirch and destroy in the mind of the public the honor, integrity, and reputation of the state's judicial officers through direct charges, innuendoes, sly suggestions and perversions of truth.

The exact words used by the defendant which constitute these contempts are set out in the judgment. Suffice it to say that these writings, authorship of which defendant, during the hearing admitted by stipulation, are far more reprehensible, contumelious, and injurious to the judicial arm of this State's government than any of the criticisms which have been held to be contempts in other cases. Even were this not the case, the offenses are so numerous and so often re-

peated as to present an exceptional circumstance. We feel, therefore, there is no question but that this defendant has committed several contempts by his utterances contained in the first group.

In many of the cases heretofore cited, defendants who have uttered writings much less serious than those of this defendant have been held to be guilty of contempt. We hold that those writings filed by the defendant with this court, as set forth in the judgment in this case, are contemptuous and constitute a clear and present danger to the administration of justice in the supreme court and in the district courts of the State of Wyoming.

Counsel objected to evidence of defendant's improper statements made during the pendency of this contempt action, but he presented no authorities which indicate that actions and utterances during a contempt action may not in themselves amount to contempts. In only one case coming to our attention have we found an instance of a defendant who has had the temerity to harass the court during an action against him for contempt, and such case would indicate that defendant's position on the subject is untenable. See Blodgett v. Superior Court of Santa Barbara County, supra.

There seems to be no logical reason why the rules regarding contempt should not apply in *any* action pending before the court (even though it be a contempt action). Otherwise a court would find it impossible to protect itself during a contempt action and the defendant might be permitted to destroy the court in the very process which sought to punish his past improper behavior.

In view of our conclusions as above expressed, that

the writings designated as groups one and two—those filed with the court during the pendency of Application of Stone, supra, and those filed with the court during the pendency of this contempt action—constitute contempt and are punishable as such, it becomes unnecessary for us to decide whether defendant's making and filing of statements with the court during a time when a case is not actually pending (which would include the writings in the third group) constitutes contempt.

As previously indicated defendant's counsel has throughout the trial repeatedly insisted that, under the provisions of the First Amendment relating to free speech and the Fourteenth Amendment relating to due process, defendant was entitled to make any statements which he might desire about the court and its personnel—however vile—and that this court or the members thereof were left to the sole remedy of libel. This position is not well taken for numerous reasons: (1) "* * * the right of the freedom of speech and of the press * * * does not * * * include the right to attempt by wanton defamation, to prejudice the rights of litigants in a pending cause, degrade the tribunal, and impede, embarrass, or corrupt the due administration of justice." 11 Am.Jur., Constitutional Law § 320.

"* * * freedom of speech and liberty of press are not absolute or unqualified rights, but are relative; that is * * * freedom of speech and press does not mean that one can talk or distribute where, when, and how one chooses * * * and does not afford one the right to * * * impede, or interfere with, the orderly administration of justice." 16 C.J.S., Constitutional Law §213 (5), citing many Federal cases.

(2) This general law which prevents any person from wantonly defaming or degrading a tribunal and from corrupting the due administration of justice be-

comes in effect a mandate under the provisions of Art. 1, § 20, of the Wyoming constitution, which provides every person may freely speak, write, and publish on all subjects, being responsible for the *abuse of that right*.

(3) The Court has always applied the clear and present danger doctrine sparingly and has never applied it so as to prevent the punishment of direct contempt of court; and in constructive contempt actions, has confined its use to specific situations which particularly impress the Court. This extreme care exercised by the Court has been consistent with the often repeated legal philosophy that protection of the collective rights of society must not be overlooked in the preservation of the rights of the individual.

"Every constitutional right or privilege must be enjoyed with such limitations as are necessary to make its enjoyment by each consistent with a like enjoyment by all, for the right of all is superior to the right of any one." 11 Am. Jur. Constitutional Law § 308. See also 16A C.J.S., Constitutional Law § 569(1). Interesting discussions on the doctrine of clear and present danger are found in 27 Notre Dame Law. 325; 38 Iowa L.Rev. 563; 52 Colum. L.Rev. 314; 10 Ark.L. Rev. 155; 39 A.B.A.J. 800; 63 Harv.L. Rev. 840; 65 Harv.L.Rev.1.

(4) The Supreme Court has repeatedly upheld convictions for contempt whenever it has appeared that there existed a clear and present danger to the court and to the administration of justice—as has been specifically found by this court in the present case.

After the close of the plaintiff's case, defendant's counsel renewed the "apology" of the defendant to the court and later discussed this matter in his final argu-

ment, requesting that it receive consideration in the disposition of the case. He did not contend that an apology, however sincere, is a defense. Additionally, an examination of the instrument which contains the so-called "apology" shows no sincerity because there was further calumny and vituperation in the very instrument itself. Furthermore, in his later publications, the statements showed directly as well as by innuendo that there was no penitence whatsoever, no intention to alter the nature of his previous improper actions, and that any such "apology" was a mockery, conceived for the sole purpose of capitalizing upon it in his publicity and in his defense.

This decision is based upon the contemptuous utterances of defendant during the pendency of Application of Stone, supra, and the present contempt case, without reference to those made at the time when neither case was actually pending. However, to confine a state court and its members to the remedies of libel and slander as their only protection against unwarranted, contumelious, and libelous attacks whenever a case is not then *actually pending* would, in effect, be to condemn that court to absolute destruction. Paradoxically, such a restriction would decree the simultaneous extinction of the very state government which the United States constitution recognizes and for which the state constitution has so wisely provided.

A judgment is concurrently issued finding defendant guilty of contempt.

Mr. Chief Justice BLUME added the following opinion:

Over thirty-five years of service on this court and my advancing years combine to place me in a singularly

disinterested position as far as personal feelings are concerned. I feel, therefore, that although I concur in all that has been said in the opinion of the court, I would perhaps be remiss in my duty to the citizens of Wyoming if I did not here present my views on the broader aspect of this situation.

It is true some of the attacks made upon this court during the period when no action or proceeding was pending before it are not of great importance, but part of them are more than insulting and, in fact, are quite serious. It is part of the State's theory that all of the attacks on the court which the defendant has made are part and parcel of a concerted and continuous plan to discredit the court because of its refusal to admit the defendant to the Bar of this State, and in this aspect should be considered an independent contempt calculated to undermine and destroy the court, and which have, according to the evidence in this case, actually resulted in lessening the confidence in and decreasing the respect for this court among a considerable number of people in an important area of this State. It seems idle to suggest that this has not given this court and its members considerable concern. The refusal to admit defendant as a member of the Bar of this State by our judgment of October 10, 1955, is, of course, somewhat different than a judgment by this court in an ordinary action. It can scarcely be doubted that the defendant's repeated and persistent attacks on this court, most of which are directly connected with the rendition of that adverse judgment, have been made with the idea in mind and with the obvious purpose that if kept up long enough they would serve as sufficient pressure to coerce this court into changing its mind and grant him the admission to the Bar which he seeks.

While the opinions of the courts generally dealing

with contempt of court recognize the necessity of upholding the majesty of the law as personified by the court, some of them, dealing with facts dissimilar to those in the case at bar, have possibly not sufficiently emphasized that factor. It seems to me we should always keep in mind that in judicial tribunals and particularly the highest judicial tribunals of both states and nation are to be found the greatest safeguard for all constitutional guarantees, and if we strike down or seriously hamper or impair the efficiency of these judicial tribunals, all freedoms, including freedom of the press and freedom of speech, will soon disappear and be lost to us forever. To destroy one is to destroy the other. It should be clear that the situation with respect to the judicial arm of government necessary to enable it to perform its function is of necessity different from that of other governmental agencies. The maintenance of the strength of this arm of government through assurance to it of a complete independence, without of course exaggerating its importance, is the very foundation of its existence. It must be borne in mind that judges and justices under elective systems are in a different situation than judges and justices under the Federal judicial system and in the few states where there are appointments for life. For an elective judicial officer to be thick skinned and completely unmindful or disregardful of political expedience or even of desire to be longer continued in judicial office is not enough to secure judicial independence. The unbridled and uncurbed attack upon a court as an institution of government or even upon an individual member of such a court, may not only serve to eventually displace the encumbents and change the personnel of the court, but additionally it serves to destroy the independence of all who may supplant them, for they are made aware that what has happened to their predecessors will, in turn, be their reward, unless they

subvert their honor and integrity to bow to similar types of pressure. Multi-membered courts, where the individuals must stand for election or re-election at different times, give added incentive to every unsuccessful or disgruntled litigant possessed of vengeful mind to carry on interminable and persistent attacks upon the court and its personnel which is felt to be responsible for the individual's lack of success. The ordinary person well knows how fruitless it would be to make attack upon the honesty, integrity or ability of Federal judges or those state judges whose positions are assured for life. That is particularly true in the case of the Supreme Court of the United States, which holds an almost, if not quite, untouchable and exalted position in the nation, and while some of its decisions have been criticized, no one, so far as I know, has ever impunged its integrity or that of its members. As aptly stated by Mr. Justice Frankfurter, the court is in a "sheltered position." It is because of the impregnable position of the Federal courts that Congress limited their power of contempt proceedings in 1789 by § 17 c. 20 of the First Congress and by § 1, c. 99 of the Congress of 1831. We have no such limiting statute. If it be thought that Mr. Justice Holmes, great lawyer and outstanding jurist that he was, and the originator of the formula of "clear and present danger", would have applied that formula with its narrow confines under the facts such as we find in the case at bar, the explanation of that could perhaps be found in the fact that he did not come in contact with the realities of life under the elective system, since he first served by appointment as justice and chief justice in Massachusetts before becoming a member of the Supreme Court of the United States. But he wrote in his "Common Law" that the life of the law is not logic but experience, and so it may well be doubted that he would have applied the foregoing formula with its

narrow confines to the facts such as confront this court, for experience, in the light of the facts before us, shows that it should temper whatever may be conceived to be the logic of the formula. Again, we are fully aware that while in the more populated states of the union, an attack upon the court, or one of its members, would hardly create a headline, we, in Wyoming, comprise but a small community of some 300,000 people, and the persistent attacks on this court of the character launched by the defendant, have given to the occurrence a publicity and importance quite beyond its deserts. I am perturbed by a precedent that any defeated litigant has a limitless right to persistently vituperate or villify a court or its members, when the litigation which gave rise to his ire has been closed. If this is to be the law of this State, I am convinced that no self-respecting lawyer would want to become a member of our judicial bodies. To be a judge has been in the past considered to be a position of so great honor that even conditions of financial well-being have been foregone in order to occupy a position which lawyers believe is not merely a worthwhile objective in a professional career, but one which gives great opportunity for service in an endeavor to which the lawyer's life is devoted. It would indeed be sad to contemplate that such high office means nothing more than to throw open the door for being subjected to persistent vicious, malicious and contemptuous attacks upon one's honesty and integrity. The often made suggestion that there is sufficient protection to be found in the right to slander and libel actions or even of criminal action for these wrongs, when viewed in the light of reality, is nothing more that a rhetorical flourish. It may be said in answer to all this that it is not likely many persons will make persistent libelous attacks on the courts. That is doubtless true so long as we keep the law of contempt and the right of free-

dom of speech and freedom of the press on a rational basis. But to lay down a precedent that persistent and continuous attacks such as made by the defendant herein may be made at will by every disappointed litigant and are not punishable by contempt proceedings, would be apt to be nothing less than a breeder of anarchy, and it is hardly within the realm of reason that the constitutional guarantees of freedom of speech and freedom of the press should be permitted to lead to that.

I have been much impressed by the remarks of Chief Judge Gourley in Ginsburg v. Stern, D.C.Pa., 125 F. Supp. 596, 602, wherein he speaks of the immunity of judges from suits under the statute regarding civil rights. Judge Gourley states that to destroy that immunity "would create an endless chain and vicious circle to which no solution or correction would ever be attained." This, it would seem, would also apply here if unrestrained license to attack this court were given. In fact if a judge or justice is corrupt, the people, under our elective system, can oust him, and there lies the further right of impeachment by the legislature. It takes no self-constituted medicine man to educate the people in these rights nor to induce the legislature of this State to do its duty. So I see no reason to exalt the constitutional guarantees of freedom of speech and freedom of the press to such overweening preponderance as will seriously impair, if, in fact, not destroy the judicial institutions which are the principal protectors and guarantors of those very freedoms. Hence, I think the theory of the State heretofore mentioned is sound under our law, and while occasional outbursts of a defeated litigant should be overlooked, persistent attacks on the integrity of the court which have a tendency to destroy it should be put on a different footing. The very fact that un-

der our law judges are elected will, ordinarily at least, serve as a sufficent guide to heed the statement of Chief Justice Marshall that the power of contempt should be used sparingly. There is, perhaps, some common sense in the old adage which we have in the West that a defeated litigant has 24 hours (some say 48) to "cuss" the court, but that he must "shut up" thereafter. It is a crude compromise between freedom of speech and, if we want to keep on being civilized, the respect necessarily due the court.

Inasmuch as the full court has not judicially determined whether or not the improper statements by the defendant during the time when a proceeding was not actually pending constituted contempt, I feel constrained to make my views on this subject clear.

It would seem most of the ad interim statements of defendant are not only relevant and material in this proceeding as casting some light upon the intention of the defendant in making the utterances which were made during the pendency of the proceedings in this court as well as having a bearing upon the sincerity or the insincerity of the defendant's purported apology, but as contended by the State, are contemptuous in themselves. However, the court is basing its judgment herein solely upon the criticism made during the pendency of the proceedings in this court.

### JUDGMENT AND SENTENCE

This matter coming on regularly for hearing on December 4, 1956, upon the plaintiff's petition, the defendant having failed to make answer in writing within the time allowed by order of this court, but being now present in person and represented by counsel in the person of Mr. John J. Spriggs, attorney at law,

Lander, Wyoming, the defendant moved in writing for the dismissal of the action. After argument the motion was denied and both parties indicated they were ready to proceed. Mr. William J. Wehrli, attorney at law, Casper, Wyoming, announced that at the instance of the President of the Wyoming State Bar Association, he and Mr. Joseph C. Galicich, attorney at law, Rock Springs, Wyoming, Mr. Thomas O. Miller, attorney at law, Lusk, Wyoming, and Mr. Joseph J. Hickey, attorney at law, Cheyenne, Wyoming, requested that they be permitted to appear as amici curiae for the purpose of giving such assistance as the court might care to accept. The court granted the request, whereupon the state presented its evidence at the close of which counsel for the defendant again moved for dismissal of the action. The motion being again denied, counsel for defendant stated the defendant reaffirmed what counsel called the defendant's apology contained in a pleading filed by the defendant in the matter, but defendant failed to present any evidence in defendant's behalf, though he was given full opportunity to do so. Whereupon arguments of the respective parties were heard and considered and the court took the matter under advisement.

Now on this 7th day of January, 1957, the defendant being present in person and appearing by counsel and being now fully advised in the premises, the court finds generally that the defendant is guilty of the several contempts charged in plaintiff's petition as occurring by the defendant's utterances made during the pendency of the defendant's application for admission to the Bar of the State of Wyoming, and guilty of the several contempts charged in plaintiff's petition as occurring by the defendant's utterances made during the pendency of these contempt proceedings, all of which are more particularly specified and set forth

hereinafter. The court further finds that the statements and utterances above mentioned were made willfully and maliciously, and that they constituted a clear and present danger to the administration of justice in the State of Wyoming. The court also finds that the so-called apology made and offered by the defendant was a sham and not made in good faith, and that the defendant should be punished accordingly.

WHEREFORE, IT IS CONSIDERED, ORDERED, ADJUDGED AND DECREED, that the defendant is guilty of contempt of this court in the following particulars:

1. THAT, on or about October 5, 1955 and during the pendency in this court of defendant's application to be admitted to the Bar of this state, the defendant did, in Sheridan, Sheridan County, State of Wyoming, require to be typed, a letter addressed to the Attorney General of the United States, a copy of which was transmitted by the defendant to this court and numerous other parties and was received by the Wyoming Supreme Court, which stated in part as follows:
"I indict the State Board of Law Examiners of Wyoming together with the Supreme Court of Wyoming with having fomented a conspiracy in concert to deprive me of my livelihood, willfully, knowingly, maliciously, and without due regard to my rights and sensibilities as such regards ought to be tendered a citizen of Wyoming and the United States of America and as a human being whose body is a temple wherein resides the spirit of God as St. Paul so nobly taught us."

2. THAT, on the same day, namely, on or about October 5, 1955, defendant did, in Sheridan, Sheridan County, State of Wyoming, require to be typed, a letter addressed to the Clerk of the Supreme Court of Wyoming, and received by this court, a copy of which was sent to Drew Pearson, commentator, to numerous

papers and publications and to some individuals, which, in part, contains the following language:

"I accuse the Wyoming Supreme Court of being unfair, prejudiced, partial and biased and am sure that I will not get a fair hearing unless the Court permits a jury of good Wyoming people to hear it. The court is trying to bury me under a maze of legal technicality but the people of Wyoming can see through this hocus pocus.

"I accuse the Supreme Court of Wyoming of deliberately delaying this matter in the misguided hope that I will run out of money or patience or both. I can assure you, sir, that I will have both so long as I live."

3. THAT, on October 5, 1956, and during the pendency of the present contempt proceeding, the defendant filed an instrument in the court entitled "Motion to Dismiss", as follows:

"APPLICATION OF J. NORMAN STONE FOR ADMISSION TO THE BAR OF THE STATE OF WYOMING

THE STATE OF WYOMING, UPON RELATION OF THE ATTORNEY-GENERAL, GEORGE F. GUY AND ASSISTANT ATTORNEY GENERAL BRUCE P. BADLEY, PRESIDENT OF THE SHERIDAN COUNTY BAR ASSOCIATION EDWARD BIRCHBY, AND G. R. McCONNELL, ATTORNEY AT LAW.
*Plaintiffs*

vs.

J NORMAN STONE
*Defendant*

NUMBER 2772
"MOTION TO DISMISS"

"J. Norman Stone, defendant herein, respectfully

moves this Honorable Court to dismiss the show cause
order and purge said defendant of contemplated con-
tempt for the reason that Saturday, September 29,
1956, defendant informed the United Press in Chey-
enne, Wyoming, that he was going to make a public
apology to the Wyoming Supreme Court. This story
was run on the UP wire and has been published in
many papers of general circulation in the state of Wy-
oming and other states. The words published were as
follows: 'I publicly apologize to the Wyoming Su-
preme Court for any aspersions cast upon its dignity.
Never had I intended to hold up to public scorn and
contempt any Wyoming Court. All that I desired to
do was to publicize the fact that I had been denied a
law license when in my opinion no valid reason for
such denial exisited.'

/s/ J. Norman Stone
J. NORMAN STONE, ATTORNEY Pro-Se

Clerk
Please set this matter for hearing and notify defend-
ant of date.

/s/ J. Norman Stone
J. NORMAN STONE

I certify that a copy of the foregoing motion was
mailed postage prepaid to George F. Guy, Attorney-
General of the State of Wyoming this 4th day of Oc-
tober, 1956.

/s/ J. Norman Stone
J. NORMAN STONE

Clerk:
If this matter is not set for hearing, or if it be set for
hearing and motion is denied, defendant respectfully
requests that he be given at least 20 full days to file
his answer and that this Honorable Court not repeat
the adroit legal maneuver which has caused confusion
and consternation in the minds of the electorate of the
Fourth Judicial District, Wyoming when it acted to de-
ny defendant a law license after he had filed a motion

for bill of particulars when served with order to show cause why recommendation of State Board of Law Examiners should be overruled. It ignored the motion for Bill of Particulars and arbitrarily and without notice or hearing handed down an opinion denying law license. This seemed so unfair and so unjust that defendant was compelled to complain and that is why he is now being cited for contempt. If this is contempt read letter to Editor of Sheridan Press by P. F. Spracklen attached hereto and come to Sheridan and listen to the voice of the people on the street corner. The question no longer is whether I obtain a law license, or even whether I am sworn in as judge if elected, but whether or not a man has a right to speak as he thinks or whether or not he must be placed in perpetual fear that a dictatorial authority whether it be now a Court and later the secret police will punish him for uttering what is in his mind and heart.

Copy of foregoing mailed to: INS, UP, AP, TIME, INC., NEWSWEEK, DREW PEARSON, HEMINGWAY, WALTER WINCHELL, GABRIEL HEATER, EDWARD R. MURROW, HON. EARLE WARREN, HON. WILLIAM O. DOUGLAS, NEW YORK TIMES, PRESIDENT EISENHOWER, DENVER POST AND HON. MILWARD SIMPSON."

4. THAT, on October 12, 1956, and during the pendency of the present contempt proceedings, defendant filed in this court an instrument entitled "Request for Grand Jury Session", as follows:

"IN THE SUPREME COURT OF THE STATE OF WYOMING

THE STATE OF WYOMING, UPON RELATION TO THE ATTORNEY GENERAL GEORGE F. GUY AND ASSISTANT ATTORNEY GENERAL BRUCE P. BADLEY, PRESIDENT OF THE SHERIDAN COUNTY BAR ASSOCIATION EDWARD BIRCHBY, AND G. R. McCONNELL, ATTORNEY AT LAW,
*Plaintiffs*

VS.

J. NORMAN STONE

*Defendant*

"NUMBER 2772"
"REQUEST FOR GRAND JURY SESSION"

"In accordance with Section 12-201 of the Wyoming
Complied Statutes, it is hereby requested that this Hon-
orable Court summons a grand jury into session es-
pecially to consider the following list of irregularities
of public officials and unethical conduct of certain
Wyoming judges and lawyers:

"1. James Reynolds, a blind Sheridan resident, 238
Brukitt reported to undersigned that on October 3,
1956 a male voice and unidentified threatened him
that if he proceeded to organize a Stone for Judge
rally his two daughters employed at the Sheridan
County Courthouse would be summarily dismissed.

"2. John Raper's public statement in the Sheridan
Press of August 18, 1956 as follows: 'If I am nominat-
ed as one of the candidates of the office, I intend to
take you behind the Judicial curtain of your Fourth
Judicial District. Some past cases of strictly public
concern will be reviewed.'

"3. Statement made by Carl Rott, Editor of the
Sheridan Press to undersigned that Judge Layman
rarely makes a decision unless it be based upon poli-
tics.

"4. Statement made by Phillip Garbutt, Sheridan
lawver that Henry Burgess Sheridan lawyer caused
to be burned in a furnace certain records at the con-
clusion of his term as County Prosecuting Attorney
for Sheridan County and that his secretary was sick
about it.

"5. Complaint by George Adams of 1558 N. Genesee
Avenue, Hollywood, California that there was unethi-

cal and unscrupulous sharp practice committed upon him by Judge Harry Harnsberger of the Wyoming Supreme Court, Judges Lewis and Sheldon of the District Courts of Wyoming and attorneys W. M. Haight, C. J. Murphy, W. A. Smith, and Frank E. Hayes all members of the Wyoming Bar Association.

"6. Complaint of Julia Kumor of Sheridan, Wyoming that William Redle, Sheridan lawyer perpetrated fraud upon her.

"7. Complaint of unethical and sharp practice by R. G. Diefenderfer, Sheridan lawyer committed against W. W. Morgareidge of Buffalo, Wyoming.

"8. Complaint of perjury committed by Henry Burgess, Sheridan lawyer, complaint made by Antonio Silva of Buffalo, Wyoming.

"9. Complaint by undersigned of failure of State Board of Law Examiners to grant hearing on law license and failure to present specific reasons.

"10. Complaint by undersigned of failure of Wyoming Supreme Court to grant hearing on law license and failure to explain 'confidential reasons.'

"11. Conspiracy by State Board of Law Examiners, Wyoming Supreme Court and Wyoming Bar Association to prevent undersigned from earing a livelihood in his chosen profession of the law.

"12. Conspiracy by Fourth Judicial District Bar Association, Attorneys John Raper, R. G. Diefenderfer and Judge Stanton to violate the and interfer with the freedom of suffrage of the voters of the Fourth Judicial District of R. G. Diefenderfer's own lips at the trial when he stated that the said Fourth Judicial District Bar Association suggested that John Raper file said suit.

"13. Conspiracy by Attorney-General George F. Guy, Assistant Attorney-General Bruce P. Badley,

President of the Sheridan County Bar Association, Edward Birchby and Attorney G. R. McConnell to deprive me of my liberty and freedom by bringing unfounded charges of contempt of court against undersigned.

"14. Complaint by Hans B. Peterson, 222 East 2 Street, Casper, Wyoming of unethical, unscrupulous and sharp practice committed against him by Edward E. Murane, Casper, attorney.

"Respectfully submitted,
/s/ J. Norman Stone
J. NORMAN STONE
Attorney at law, pro-se

"Copies Mailed to:
INS
UP
AP
TIMES, INC.
NEWSWEEK
WALTER WINCHELL
NEW YORK TIMES
HEMINGWAY
DREW PEARSON
GABRIEL HEATER
EDWARD R. MURROW
HON. EARLE WARREN
HON. WILLIAM O. DOUGLAS
GEORGE E. SOLKOLSKY
FULTON LEWIS, JR.
FREEDOM FOUNDATIONS AT VALLEY FORGE
KING FEATURES SYNDICATE, INC.
LOS ANGELES HERALD
SAN FRANCISCO EXAMINER

5. THAT, on October 22, 1956, and during the pendency of the present contempt proceeding, defendant filed an instrument in this court entitled "Motion for Jury Trial for Disqualification of Judges Blume, Harnsberger, Parker, Lewis, Sheldon and Stanton and

for Trial to be Conducted in Sheridan, Wyoming", as follows:

"IN THE SUPREME COURT OF THE STATE OF WYOMING

"APPLICATION OF J. NORMAN STONE FOR AD-MISSION TO THE BAR OF THE STATE OF WY-OMING

"THE STATE OF WYOMING, UPON RELATION OF THE ATTORNEY GENERAL GEORGE F. GUY AND ASSISTANT ATTORNEY GENERAL BRUCE P. BADLEY, PRESIDENT OF THE SHERIDAN COUNTY BAR ASSOCIATION, EDWARD BIRCH-BY AND G. R. McCONNELL, ATTORNEY AT LAW,
*Plaintiffs*

vs.

J. NORMAN STONE

*Defendant*

NUMBER 2772

"Motion For Jury Trial, For Disqualification of Judges Blume, Harnsberger, Parker, Lewis, Sheldon and Stanton for Trial to be Conducted in Sheridan, Wyoming. "Comes now defendant, J. Norman Stone, and respectfully requests that this Honorable Court grant a jury trial, disqualify its Judges Blume, Harnsberger, and Parker and Judges Lewis, Sheldon and Stanton and that it order the trial to be held in Sheridan, Wyoming and for reasons therefore states as follows:

"1. Sixth Amendment of U. S. Constitution.

"2. Questions of fact are for the jury, and questions of law are for the Court. 29 CJS 467.

"3. A jury trial may be demanded in all ordinary actions at law where issues of fact arise on the pleadings. 50 CJS 730.

4. If reasonable persons might arrive at different conclusions from established facts, the questions should be submitted to the jury. Wyoming Complied Statutes, Volume 1, page 241.

"5. Wyoming Constitution Article 1, Section 9 which says the right to trial by jury shall remain inviolate in criminal cases.

"6. The charge made against defendant is criminal contempt.

'A criminal contempt is conduct that is directed against the dignity and authority of the court or a judge acting judicially.' 17 CJS 7.

"7. Judge Stanton stated when he refused to grant jury trial when he took my name off the ballot and turned my votes over to John Raper placing his name on the ballot and ignoring the Wyoming law which says there must be a new election that a man is entitled to a jury trial in a criminal case.

"3. A judge who is prejudiced against a person cannot fairly and impartially determine whether or not that person has so acted so as to have created such prejudice in the mind of the judge. Since contempt is of a criminal nature the only fair procedure would be for a jury to determine if there was contempt. Certainly the fact that I publicized the unethical and unjudicial behavior of the above mentioned judges is sufficient reason for them to harbor prejudice per se and no person can be guaranteed a fair trial in such a clouded and heated atmosphere.

"9. The fact that Judges Blume, Harnsberger, and Parker refused to dismiss the complaint of contempt after I had tendered a public apology is ipso facto proof of prejudice tinged with vindictiveness which is the worst kind of prejudice.

"10. I feel that I would receive a fair trial by an impartial jury of the good and reasonable people of

Sheridan and since a judge of another district ought to be called in the logical place for him to hold the trial would be Sheridan.

"/s/ J. Norman Stone
J. NORMAN STONE
ATTORNEY AT LAW PRO-SE

"Clerk:
Please set this motion for hearing and notify me of date.

"/s/ J. Norman Stone
J. NORMAN STONE

"Clerk:
"I have received many letters complaining of the unfairness of some of the Wyoming judges. One by George M. Adams dated October 2, 1956 from Hollywood, California reads in part: ' . . . and I know that a bunch of Legal Shysters in Wyoming who are also in the Supreme Court and District Court of Wyoming.' Another letter from Henry C. Moore, Moorcroft, Wyoming reads in part as follows: 'As an outsider looking in it looks to me the Wyoming Supreme Court has miserably failed in the duties and obligations entrusted to it by the people of the State of Wyoming.' George E. Solkolsky in a syndicated article appearing in the Sheridan Press October 4, 1956 states in part as follows: ' . . . but the citizen has no means of expressing opposition to a judge; nay, he may even be held in contempt of said court for questioning the omniscience of one who wears the robe, even if he knows in detail how the judge came to be appointed and this his qualifications as a lawyer and a judge were not even considered.' Nobody is taking any contempt action against these people or the thousands who criticize courts. The Attorney-General and the Wyoming Bar desire to besmirch my good name and reputation so as to prevent me from winning the forthcoming election and are using this unsavory method in that attempt.

"I attended a Republican Rally in Sheridan the other

night and heard Congressman Joseph Martin of Massachusetts urge the voters to elect Ike because he opens all deliberations with prayer. Because I made such a suggestion this Honorable Court termed me a religious fanatic and denied me my law license.

"Copy mailed to:

AP
UP
INS
TIME, INC.
NEWSWEEK
WALTER WINCHELL
NEW YORK TIMES
HEMINGWAY
DREW PEARSON
GABRIEL HEATER
EDWARD R. MURROW
HON. EARLE WARREN
HON. WILLIAM C. DOUGLAS
GEORGE E. SOKOLSKY
FULTON LEWIS, JR.
FREEDOM FOUNDATIONS AT VALLEY FORGE
KING FEATURES SYNDICATE, INC.
LOS ANGELES HERALD
SAN FRANCISCO EXAMINER

6. THAT, on October 24, 1956, and during the pendency of the present contempt proceeding, defendant filed an instrument in this court entitled "Request for an Additional Thirty Days to File Answer", as follows:

"IN THE SUPREME COURT STATE OF WYOMING

"APPLICATION OF J. NORMAN STONE FOR ADMISSION TO THE BAR OF THE STATE OF WYOMING

"THE STATE OF WYOMING, UPON RELATION OF THE ATTORNEY GENERAL, GEORGE F. GUY

AND ASSISTANT ATTORNEY GENERAL, BRUCE P. BADLEY, PRESIDENT OF THE SHERIDAN COUNTY BAR ASSOCIATION, EDWARD BIRCH- BY AND G. R. McCONNELL, ATTORNEY AT LAW
*Plaintiffs*

vs.

J. NORMAN STONE

*Defendant*

NUMBER 2772
"REQUEST FOR ADDITONAL THIRTY DAYS TO FILE ANSWER

"Comes now defendant, J. Norman Stone, and respect- fully requests that this Honorable Court grant him an additional 30 days to file his answer in the above entitled cause and for reasons there states as follows:

1. Defendant is busily engaged in a one-man truth squad campaign for the defeat of Judge Glenn Parker of the Wyoming Supreme Court who is a prejudiced in- dividual because he refused to permit an open hearing on my law license and has refused all proper requests in this case including the appointment of an attorney in this criminal case. He believes in justice for the privileged few. I shall cast my vote for John Spriggs who stated in a radio broadcast that the Wyoming Su- preme Court is unfair and who believes in justice for all—impartially. Ten years ago the Supreme Court of Wyoming closed his law office for six months be- cause he dared to stand up to their unfair behavior. I am doing the same thing and thy want to jail me.

"2. Defendant is busily engaged in campaigning for a write-in vote for himself as judge. If he is victorious no Supreme Court of Wyoming can keep him from being seated because they too must obey the law and this matter will be fought through the Federal Courts in this country up to and including the Supreme Court of the United States.

"3. If Judge Parker votes not to permit this ex-

tension of 30 days the voters will be able to judge for himself that he wants to jail defendant and shut him up as quickly as possible so that he will not be able to tell the people the truth of what is going on.

"Respectfully submitted,
/s/ J. Norman Stone
J. NORMAN STONE
Attorney at Law, pro-Se
Candidate, Judge 4th Judicial District

"Clerk: Please set this motion for hearing and notify me of date.

J. Norman Stone
/s/ J. Norman Stone

"Copy mailed to:

AP, UP, INS, TIME, INC., NEWSWEEK, WALTER WINCHELL, NEW YORK TIMES, HEMINGWAY, DREW PEARSON, GABRIEL HEATOR, EDWARD R. MURROW, HON. EARLE WARREN, HON. WILLIAM C. DOUGLAS, GEORGE SOKOLSKY, FULTON LEWIS, JR., FREEDOM FOUNDATIONS AT VALLEY FORGE, AMERICAN HERITAGE FOUNDATION, KING FEATURES SYNDICATE, LOS ANGELES HERALD, SAN FRANCISCO EXAMINER, PALMER HOYT, ROBERT CRATER."

7. THAT, on October 27, 1956, and during the pendency of the present contempt proceeding, the defendant published in his paper "Stone's Shooting Star", a copy of which was by defendant transmitted to and received by this court, the following:

"I offended a very prominent national figure in Washington, D.C. and the Wyoming Supreme Court is being used by him to 'get even.' How do I know?
"The Wyoming Supreme Court let it slip in the opinion. It is said there is no perfect murder. The murderer always slips up. Well they slipped up here because they tried to murder my reputation and having for so long continued in their despotic manner never

thought that I would stand up to them and demand an accounting."

8. THAT, on November 3, 1956, and during the pendency of the present contempt proceeding, the defendant published in his paper "Stone's Shooting Star", a copy of which was transmitted to and received by this court, the following statement:

"SENSATIONAL EXPOSE

"J. Norman Stone will present evidence of deceit, fraud, slander, libel, defamation of character, collusion, conspiracy and outright falsehoods by the State Board of Law Examiners and the Wyoming Supreme Court soon in STONE'S SHOOTING STAR.

"The Sheridan Press and radio station KWYO dared not permit it to be revealed because they feared what these dictators would do to them. STONE'S SHOOTING STAR isn't worried because this is a free country and it can say what it darn well pleases—just so long as it is the truth—which it is!"

9. THAT, on December 1, 1956, and during the pendency of the present contempt proceeding, the defendant published in his paper "Stone's Shooting Star", a copy of which was transmitted to and received by this court, the following statement:

"NOTICE TO WYOMING SUPREME COURT

*　　*　　*

There is no doubt that the minds of the judges are poisoned and that I have been found guilty of contempt long ago. This trial is a mere formality as was the trial when Judge Stanton removed my name from the ballot in kangaroo fashion. The Attorney General and the judges of the Wyoming Supreme Court are dangerous men and so long as they remain in power the

freedom and even the lives of Wyoming citizens are not safe from jeopardy. They do not respect the Bill of Rights of the U.S. Constitution and the Wyoming Constitution and are ignorant of God's natural laws. They are a disgrace to our way of life and their swift removal from office is recommended if democracy in Wyoming is to survive.

History will record their infamous deeds which have blotted the shining pages of the Equality State. If, by sitting in a prison cell, I can arouse the American people to the realization that we in Wyoming have lost our liberty, then I shall consider this tyranny as a martyred sacrifice upon the altar of freedom."

IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED AND DECREED that as punishment for the aforesaid contempts the defendant be, and he is hereby, sentenced and directed to be imprisoned in the county jail of Laramie County, Wyoming, for the period of six months and that he further pay a fine to the Clerk of this Court in the sum of One Thousand Dollars, and that the defendant be imprisoned in said jail until said fine is paid, but not exceeding three months over and above the term of imprisonment first above mentioned.

IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED AND DECREED, that the said J. Norman Stone be placed and remanded to the custody of the Sheriff of Laramie County, Wyoming, and be kept and confined according to the foregoing judgment and sentence, and in accordance with the warrant of Commitment issued concurrently herewith.

IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED AND DECREED, that the opinion of this court filed herein this date and concurrently herewith be, and the same is, hereby made a part of this judgment and sentence.

Done in open court this 7th day of January, 1957.

/s/ Fred H. Blume
CHIEF JUSTICE

THE STATE OF WYOMING )
 ) ss
COUNTY OF LARAMIE )

I, Fred S. Fobes, Clerk of the Supreme Court of Wyoming, do hereby certify that the foregoing is a true and correct transcript of the judgment of said court in the above entitled proceeding.

Witness my hand and the seal of said court this 7th day of January, A.D., 1957.

/s/ Fred S. Fobes

CLERK OF THE WYOMING

SUPREME COURT.

(SEAL)

## WARRANT OF COMMITMENT

The State of Wyoming to the Sheriff of Laramie County, Wyoming:

WHEREAS, J. Norman Stone has been duly adjudged to be guilty of contempt of the Supreme Court of Wyoming and said court has pronounced its judgment and sentence against him, that he be punished by being imprisoned in the county jail of Laramie County, Wyoming, for the period of six (6) months, and that he further be fined in the sum of One Thousand Dollars ($1,000.00) and imprisoned in said jail until said fine is paid, not exceeding three (3) months over and above the imprisonment first above mentioned, all of which appears in the certified transcript

of the judgment attached hereto and made a part hereof.

Now this is to command you, the said Sheriff of Laramie County, Wyoming, that you do forthwith take said J. Norman Stone into custody and keep and imprison him in the county jail of Laramie County, Wyoming for the term of the sentence imposed as aforesaid and according to the conditions above stated.

And these presents shall be your authority for the same. Herein fail not.

WITNESS, The Honorable Fred H. Blume, Chief Justice of said Supreme Court, and the seal thereof, at Cheyenne, Wyoming, this 7th day of January, A.D., 1957.

Fred S. Fobes
CLERK OF THE SUPREME COURT OF WYOMING.